(No. 23654.—

CHARLES W. HALL, Appellant, *vs.* GEORGE W. PITTENGER *et al.* Appellees.

*Opinion filed December 10, 1936—Rehearing denied Feb. 3, 1937.*

WHAM & WHAM, and SMITH & MURRAY, for appellant.

WILSON & WILSON, GILBERT & GILBERT, and THOMAS H. CREIGHTON, for appellees.

Mr. JUSTICE SHAW delivered the opinion of the court:

On December 7, 1934, Charles W. Hall filed his complaint in chancery in the circuit court of Marion county by which he sought to set aside certain conveyances of real estate and the assignments of certain chattel mortgages and a lease. His action was founded on a contention that he had been insane on April 5 and 6, 1933, when the transfers took place. After a full hearing, during which the circuit court heard the oral testimony of 104 witnesses and received in evidence 105 exhibits, the complaint was dismissed for want of equity. Fee simple title to various tracts of real estate being involved, the record is brought to this court for review upon the direct appeal of Hall.

Upon oral argument in this court it was admitted by both parties that no controverted question of law is involved. The chancellor who tried the case received the

evidence in open court, saw the witnesses and heard them testify. Under these circumstances we will not disturb the findings of the chancellor unless manifestly and palpably wrong; and this is true even though we might be inclined to find otherwise had we been placed in his stead upon trial of the suit. (*Schrader* v. *Schrader*, 298 Ill. 469; *Brown* v. *Stewart*, 159 id. 212.) We will therefore limit our review to determining whether or not the chancellor was manifestly or palpably wrong or his conclusion manifestly erroneous.

A general survey of the entire record shows that prior to the recent financial depression the appellant, Hall, was a middle-aged business man of considerable ability and energy but operating to a dangerous extent on borrowed capital. His business career in Centralia covered a period of more than twenty years prior to the transactions here in question, during which time he had owned and operated a lumber yard, an implement, hay and grain business, an automobile business and garage, two finance companies, two theaters, a hotel and an apartment house, besides other business ventures. All of these appear to have been successful prior to 1929, and his annual volume of business at times had been as much as $300,000. In 1927 he purchased a three-story hotel building from the appellee Pittenger for $95,000, of which $25,000 was paid in cash and the balance by a purchase money mortgage for $70,000. The following year he purchased from Pittenger the property known as the apartment house or Masonic building. The purchase price of this property was $85,000, of which $52,000 was paid by a purchase money mortgage. There were other transfers of real estate which will be noticed later, but the point principally involved concerns the two tracts above mentioned.

In the beginning of the year 1933 Hall's financial affairs were in a very precarious condition, and it was impossible for him, under the depressed conditions then existing, to

meet his obligations as they were maturing. On the previous Thanksgiving day, at which time his nervous breakdown is supposed to have begun, he had disclosed to his family and children that he was seriously embarrassed and that it would be necessary to liquidate the business of the Hall Motor Company. This was a family company, the stock all owned by Hall and his wife, and its affairs were entangled with his other difficulties. There is considerable divergence in the claims of the parties as to Hall's actual financial condition at the beginning of 1933, but he himself admits that the indebtedness for which he and his wife were personally liable was about $94,000, without considering items of interest and unpaid taxes. This, we think the record shows, is an under-statement. The two first mortgages on the hotel and apartment properties total more than $72,000, for which Hall and his wife were personally liable, and there was also a second mortgage on the same properties for $40,000, making a total record encumbrance of $112,000 upon these two properties alone, not considering interest or taxes. Hall insists that the $40,000 second mortgage did not represent any real indebtedness, but the facts shown by the record are that these second mortgage notes were hypothecated as collateral to secure various indebtednesses of the Hall Motor Company and of Hall personally, and that Hall was liable as endorser upon the Hall Motor Company paper. Besides these items Hall was personally indebted to the receiver for the Merchant's State Bank of Centralia in a sum exceeding $7000; to the Centralia Building and Loan Association in the sum of $2800; to a sister (Mrs. Tracy) in the sum of $10,000; to another sister (Mrs. Merritt) in the sum of $5000, and to his father, Henry Hall, in the sum of $10,000—all of these items being in addition to numerous secondary and indirect obligations on account of endorsement of paper for the various companies which he controlled. On the whole record it is clear that Hall was insolvent and his financial difficulties entirely beyond solution on January 1, 1933.

One of Hall's greatest difficulties seems to have been the insolvency of the Hall Motor Company, with outstanding obligations guaranteed by Hall personally or secured by collateral furnished by him. This company owed the Firestone Tire and Rubber Company more than $2200, upon which judgment was taken the following March. It also owed various notes which were personally endorsed by Hall, and in addition to these matters it owed the Missouri State Life Insurance Company $38,000 and interest, which was secured by a mortgage on the garage building and a vacant lot. In January of 1933 the Missouri State Life indebtedness was settled by conveyance of the garage to the insurance company and by the release by the insurance company of the vacant lot. Simultaneously with the release of this vacant lot it was conveyed to Hall's sister Mrs. Tracy, so that it did not stand in the company's name when the Firestone judgment was later obtained. In this settlement, which was between the Hall Motor Company and the Missouri State Life Insurance Company, the insurance company had been represented by an agent named Ray O. Burks, whose home was in Arkansas. It was his business to look after mortgaged farms and other properties for insurance companies, and he was sent to Centralia for that purpose in this case. The record indicates that Burks first became acquainted with Hall during these negotiations, and that Hall employed him to negotiate with Pittenger for a settlement of the mortgage indebtedness upon the hotel and the apartment building. It is claimed by Hall that Burks conspired with the Pittengers to defraud him in this transaction, but there is no evidence of any conspiracy, nor is there any evidence of any fraud or misrepresentation nor of the existence of any confidential or fiduciary relationship between Hall and Burks or between Hall and the Pittengers.

During the period of Hall's supposed insanity he continued to transact business. On January 26 or 27, 1933,

he completed his negotiations with the Missouri State Life Insurance Company, and, acting as president of the Hall Motor Company, joined by his wife as secretary, he conveyed the garage property of that company to the insurance company. On the same date the same parties conveyed the vacant lot above mentioned to his sister Mrs. Tracy. During the month following he appears to have continued to do business with his bank, and on February 21, 1933, he completed the liquidation of the Hall Motor Company by giving two bills of sale, one to his daughter, Pauline Wilson, conveying all furniture, office equipment, automobiles, uncollected notes, etc., including all equities and property of every kind. On the same date he individually gave a bill of sale to his sister Mrs. Tracy, conveying all furniture, fixtures, apparatus, equipment, bedding, silverware, etc., located in the apartment building which is in controversy in this suit.

The transactions which are here called in question arose out of an agreement consummated April 5 and 6, 1933. At that time Pittenger had two foreclosure suits pending against Hall—one on the hotel property and another on the apartment building. Pursuant to the agreement which Hall now challenges, he and his wife deeded the two properties to Pittenger. Nell I. Tracy, Hall's sister, deeded the vacant lot to Pittenger, and she also gave Pittenger a bill of sale to the furniture which had been conveyed to her. In return for this property Pittenger canceled the two mortgages and all sums due under them and paid $13,500 in cash. This sum of money was divided as follows: $5000 of it was accepted by the holders of the $40,000 second mortgage notes at the rate of twelve and one-half cents on the dollar and the second mortgage was released, and $2000 was paid to Mrs. Tracy for the vacant lot and $500 for the furniture. The remaining $6000 was paid to Hall and accepted by him. In this settlement he insisted upon and received Chicago drafts. The various documents nec-

essary to effectuate this transaction appear to have been prepared by Pittenger's attorney in Centralia and to have been signed in his office. It is claimed by Hall that he was insane at the time and that the parties would not let him consult his own attorney. On the other hand, it is claimed that he did not wish to consult his own attorney and avoided that attorney's office because of a fear that various bank claims would be made against the money if the attorney knew that he had it. It is quite clear, however, that Hall took the papers and kept them over night before consummating the transaction, which was done upon the day following the execution of the various documents. It was necessary in closing the deal to go to Sandoval, Illinois, and settle with H. H. Bellamy, a banker of that city, who was trustee under the second mortgage, and also to go to Patoka, Illinois, and settle with L. E. Green, a cashier of the Patoka State Bank. Bellamy later appeared as a witness for Hall and testified that although he made the settlement with Hall he considered him to have been of unsound mind at the time. As against this testimony, Green, of the Patoka State Bank, testified that Hall negotiated the transaction, did all of the talking, and was, in his opinion, of sound mind. The other witnesses to the transaction corroborated the witness Green rather than Hall or Bellamy. The two bankers were satisfied with the twelve and one-half per cent payment on the second mortgage, the transaction was closed, the mortgage released, and Hall sent his $6000 to Chicago, where it was deposited in an account in the Northern Trust Company, which he had previously opened in the name of one of his sons.

The furtive and secret nature of the above transaction is much discussed in the briefs. It is claimed on behalf of Hall that Burks and the Pittengers kept him from consulting with his attorney, secreted the nature of the transaction, insisted that he send the money out of town, and hurried him out of town immediately thereafter for fraudulent

and corrupt reasons. It is answered and testified to, on the other hand, that Hall himself wished to keep the transaction in question a secret; that his attorney was also attorney for the old National Bank and other creditors of the Hall Motor Company, and that Hall feared if the attorney knew he had any money it would be attached; that he did not want it known locally that he had saved anything after payment of the $40,000 second mortgage, but, on the other hand, wished it to be thought that his funds were entirely wiped out. The finding and decree of the trial judge would indicate that he was inclined to accept the second theory.

Shortly after the above transaction was closed Hall and his wife made a trip by automobile and trailer to Hot Springs, Arkansas, and back. He then made a trip to Chicago, where he paid $3000 out of the $6000 he had on deposit, to some of his children to whom he claimed to be indebted. The first week in May he seems to have come back to Centralia on account of the death of his father, with whom he had been closely associated in business. It is claimed that at this time he refused to have anything to do with the arrangements for his father's funeral and that he acted very peculiarly in connection therewith; also that, although named as one of the executors in his father's will, he refused to qualify or participate in the settlement of that estate. Shortly after the death of his father Hall became a voluntary patient in the Anna State Hospital for the Insane for observation and treatment. He remained but a few days and came home, after which his family took him to a farm in Kentucky, where it is claimed he did many crazy and abnormal things. According to Hall's testimony he began to get back to normal on Decoration day of 1933. In July of 1933 he organized the Metro Finance Company, and nearly a year and a half later, after Pittenger had spent large sums in rehabilitating the hotel and apartment properties, paid the taxes and re-furnished the two buildings, Hall served his notice of disaffirmance of the transaction

of April 5 and 6 of 1933 and demanded a re-conveyance. This suit was started in December following the notice of disaffirmance of October 20, 1934.

To sustain his allegation that he had been insane on April 5 and 6, 1933, Hall submitted his own testimony and that of thirty-four other witnesses. Among these were four doctors who testified as experts, and also Hall's brother-in-law, Dr. Edwards. Included in the number were some lay witnesses who admitted themselves prejudiced against Pittenger and several who were either working for or had worked for Hall. Also included were a niece and her husband, two of Hall's sisters, his banker, his wife, two of their children and a son-in-law. The testimony of the expert witnesses who testified for Hall tended to show that in their opinion he had been suffering from a manic depressive form of insanity in April of 1933, although two of these experts who had testified in answer to hypothetical questions would give no opinion when facts proved by the defendants were added to the questions they had previously answered. On the other side of this issue the defendants offered the testimony of twenty-eight witnesses, some of whom had worked for Pittenger but none of whom were related to him. These witnesses included several experts, among them the doctors at the Anna State Hospital for the Insane who had examined Hall in May of 1933. The testimony of these witnesses was to the general effect that although Hall was in a nervous and mentally distressed condition in the spring of 1933 he was at all times capable of transacting ordinary business, and by the experts it was testified that he was suffering from a nervous disturbance but no form of insanity.

The records of the Anna State Hospital were introduced in evidence and show that Hall was admitted to that institution on May 12, 1933, as a voluntary patient and was discharged on May 15. A summary of those records shows that the patient had a history of being worried on account

of financial reverses, and that at one time he had threatened to commit suicide, but that he showed no conduct disorder. The records further showed that he coöperated well during the mental examination, answering questions properly, coherently and relevantly. There were no hallucinations or delusions, and he was stated to be well oriented in all three spheres. His examination showed that he had a good insight into his condition and that he stated he came there to obtain rest. Soon after his admission he changed his mind and stated that he would not and could not remain any longer. The record showed his physical examination to be in all respects nearly perfect. The record of a staff meeting held upon his case, attended by Drs. Nobles, Hamilton, Benton, Cole and Cohen, showed a general agreement that the patient was not suffering from a depressive manic insanity but was classed as a case of psychoneurosis of the anxiety type. It will be noted that this examination was made about a month after the transactions here in question and seventeen months before any notice of disaffirmance.

In his own behalf Hall testified at considerable length. He gave a detailed and exact history and full account of his life and business transactions up to and including his purchase of the two properties from Pittenger. He stated that he dated his breakdown from Thanksgiving of 1932, and that from that time on, in his own words, he was "completely under." He said he was worried about not being able to pay his debts, and that after he suffered his breakdown he was unable to do anything, being mentally depressed and nervous; that after Thanksgiving he was worried, unable to concentrate and could not transact any business at all; that at night he walked the floor, wringing his hands, and that he had attempted suicide a number of times, being unable to count how many. He said his first attempt at suicide was to have a train hit him, which was just before Thanksgiving; that he had timed the train com-

ing from St. Louis around 10:00 o'clock in the morning; that he had a considerable insurance, some of it of the double indemnity type, so that, as he testified, he calculated that if he could get himself killed by a train while on business for one of his companies his beneficiaries would get double indemnity. He further testified that he timed the train and figured just when it would come by; that he then told his help at the office that he was going to Sandoval to the bank on business; that it was a cold November day, and that everything worked fine until he got up to within two hundred feet of the crossing and made his car stall. He testified that it was his full intention to drive in front of the train so that it would hit him, but that he got to thinking about it and just could not do it; that at that time he was driving the car quite a bit and again tried to do the same thing, but when the train came along he was unable to carry out his plan. He further testified that he carried a revolver and tried to commit suicide but could not get up the nerve to pull the trigger. He testified to the details of the settlement made with the Missouri State Life Insurance Company and also to the details of the transaction which he later repudiated. It was his testimony that Pittenger's attorney and Burks had practically made him sign the papers, although his only detailed statement of any facts to substantiate this conclusion is this direct quotation imputed to Burks: "Well, if you see your attorney, you won't get anything, the old National Bank will get it and you won't get anything and you need a little money to get out of town." The only statement attributed to Pittenger's attorney was, "Well, Charles, you promised to sign." His testimony as to the other transactions at Sandoval and Patoka and as to the details of what became of the $13,500 paid by Pittenger is strictly in accord with the testimony of the other witnesses, except that he claims that Burks did all the talking and that he merely acquiesced. On cross-examination he gave further details

as to the various business transactions in which he had been engaged and further particulars in regard to the companies controlled by him. He stated he owned four-fifths of the stock of the Hall Motor Company, the remainder of it being owned by his two nephews, and later by him and his wife when the nephews got out of the business. He testified that the mortgage was $38,000 and that he transacted the business with the Missouri State Life Insurance Company. Later, and on the same page of testimony, he said that he signed the papers because someone asked him to. A little later, and on the next page of testimony, he stated that he presumed he knew what he was doing. He recollected a deed to his sister which had been executed by him as president of the Hall Motor Company on January 24, 1933, and also recollected the deeds and bills of sale which are mentioned earlier in this opinion, and further said he presumed he knew he signed them. It was his testimony that all the things he did were suggested by someone else and that he merely used his signature. He testified to being served with summonses in the foreclosure suits and to communicating with his attorney about them. After the transactions in connection with the release of the second mortgage for twelve and one-half per cent of its face, he testified that he knew something about what they were at Patoka and Sandoval for, and that he would not say he did not know anything at all; that he knew he was trying to get the second mortgage released and that he was along with Burks for that purpose; that he knew he was going to get some money if the deal went through but did not know how much; that at the time of testifying he did not know whether he then understood it but knew afterwards that he was going to get to pay on the second mortgage at the rate of twelve and one-half per cent. In regard to his attempts at suicide he testified on cross-examination that he told people at home before leaving the garage that he was going to Sandoval on business, so that if he got killed there would

be proof he was on business, and that he had planned it for several days so that if he got killed on business it would be double indemnity on the policy. As to certain conversations in the office of Pittenger's attorney, he stated on cross-examination that he remembered them distinctly. At one point in his testimony he stated that he began to get back to normal on Decoration day of 1933, and at another place stated it was Decoration day of 1934. His recollection as to what became of the $6000 he received from the transaction was very clear and entirely accurate. He admitted that he told Burks to go and see Pittenger and find what he could do about working out the settlement.

As to the actual market value of the property received by Pittenger and relinquished by Hall in the above transaction there is little or no competent evidence in the record. Hall claims that Pittenger received equities worth nearly $70,000 in return for the $13,500 paid by him. On the other hand, Pittenger claims that, considering the depreciated condition of the property, the necessity for extensive repairs, re-building and re-furnishing, he paid full value for what he received. The estimate made by Hall would appear to disregard the $40,000 second mortgage which was released, and is largely based on the high prices paid by him for the property during a period of economic optimism. As against this, Pittenger produced evidence showing the actual cost of building the properties and furnishing them some twenty-five years before, and if these figures be accepted and a reasonable rate of depreciation applied it would seem that he obtained no great bargain. All of the witnesses agree that there was no market for real estate at the time of this transaction and that in their opinion real estate values had depreciated from forty to sixty per cent. In one particular the brief filed on behalf of Hall clearly bears out this immense depreciation in values, because it is said by him that the $38,000 settlement negotiated by the Missouri State Life Insurance Company was handled by

his brother-in-law and his attorney, and that that settlement was a good one, because the insurance company was afterwards unable to sell the building for $25,000.

Considering the record as a whole and bearing in mind the stringent economic conditions prevailing in the spring of 1933, of which we have frequently taken judicial notice, we can find nothing in the record to prove any such gross over-reaching as to indicate either fraud on the one hand or mental unsoundness on the other. On the other hand, we are inclined to believe that the chancellor, who heard the witnesses testify, probably found that the deal was a fair one at the time it was made, and that Hall knowingly and understandingly made it in order that he might get $6000 ready cash for the immediate use of himself and family and without knowledge on the part of his other creditors.

On the issue of insanity we are also satisfied with the conclusions reached by the chancellor. It cannot be said that the weight of the evidence, either expert or lay, preponderates in Hall's favor. The doctors who examined him at the Anna State Hospital did so at a time long before any litigation was contemplated, and their examination, as shown by the record, was full and complete, both from a mental and physical standpoint. They unanimously agreed in conference that Hall was suffering from a disordered nervous condition due to his heavy financial losses and worry about them, and that he was not suffering from any disease of the brain or any form of insanity. Many other pertinent facts in the record go to sustain this conclusion. Thus, the witness Green, from the Patoka State Bank, who appears to have been entirely disinterested, testified that Hall did the talking and made the deal for retiring the second mortgage notes at twelve and one-half per cent of their face value. A stenographer brought in her note book and testified, and rather clearly established the fact, that Hall had personally dictated the various bills of sale made in Feb-

ruary of 1933 whereby he liquidated the Hall Motor Company and transferred various properties to his daughter and sister. Still more persuasive is Hall's own testimony, a reading of which leaves the impression that he not only knew but understood and remembered all of the various business transactions in question. Even his plans for suicide indicated business acumen. Without pausing to comment upon the moral aspects of his admitted scheme to defraud the insurance companies, it is nevertheless apparent that even in his moments of deepest depression and most hopeless despair he retained the knowledge that certain legal consequences would ensue and certain profits would accrue to his estate if he should be killed by a train while on business. It is also to be noted that Hall's creditors placed no very great value upon his equity of redemption at the time the deal with Pittenger was made or they would not have accepted $5000 for a release of the $40,000 second mortgage.

It would unreasonably and unnecessarily prolong this opinion to attempt a detailed review of the testimony of all of the numerous witnesses. As stated at the beginning, we have limited our review to determining whether or not the chancellor was manifestly or palpably wrong or his conclusions manifestly erroneous. We have indicated the general nature of the testimony and the things it tended to prove on each side of the case. We find ample evidence to sustain the chancellor's finding that Hall was not insane at the time of the transaction in question, that he was not over-reached in that transaction, that there was no fiduciary relationship involved, that Burks was the agent of Hall rather than of Pittenger, and that there was neither conspiracy nor fraud shown to exist.

We are satisfied that the decree of the circuit court dismissing the complaint for want of equity is the only decree that could properly be rendered on this record, and it will therefore be affirmed. *Decree affirmed.*