In re Estate of Rochester Sandusky and Appeal of
Iva Kidd Sandusky.

Gen. No. 9,388.

2

the October term, 1943. Heard in this court at Opinion filed October 25, 1943. Rehearing denied January 17, 1944.

COTTON, CANRIGHT & MASSEY, of Paris, for appellant.

ACTON, ACTON, BALDWIN & BOOKWALTER, of Danville, for appellees; W. M. ACTON, of Danville, of counsel.

MR. PRESIDING JUSTICE DADY delivered the opinion of the court.

Rochester Sandusky died at Danville, Vermilion county, Illinois, on July 27, 1941.

The appellant, Iva Kidd Sandusky, claims she was married to Rochester Sandusky at Hopkinsville, Kentucky, on February 8, 1934. This is denied by the appellees, who are the executors and heirs at law of decedent. The sole question is whether appellant and Rochester Sandusky were so married.

For brevity, Rochester Sandusky will be referred to as "Sandusky."

In the testimony the appellant, Iva Kidd Sandusky, is referred to by some but not by all of her witnesses

as "Iva Kidd Sandusky," or "Mrs. Sandusky," and is referred to by appellees' witnesses as "Iva Kidd." To avoid confusion she will be referred to as the "appellant."

Sandusky was born October 18, 1853. He was never married, unless married to appellant. Apparently he always lived in Vermilion county, at or near Danville. During his active life he was a farmer.

During the winter of 1938, 1939, and many prior winters, he stayed at Boca Grande, Florida, returning to Vermilion county each spring.

In March 1939, Sandusky went to live at the home of appellant in Central Park, in or near Danville. As far as the record shows, this was the first time they ever occupied the same house. Thereafter he lived at such home of appellant until January 4, 1941, on which date he was taken to a hospital in Danville, where he remained until his death.

On August 1, 1941, his sister, Belle S. James, filed in the probate court of Vermilion county her petition which alleged that Sandusky left real estate of the value of $100,000 and personal estate of the value of $5,000, and left his sister and nephews and nieces as his heirs, legatees and devisees. The petition asked that a purported will of Sandusky, dated August 20, 1934, be admitted to probate.

On August 25, 1941, appellant filed in the probate court her petition which alleged that Sandusky left real estate of the value of $150,000 and personal estate of the value of $25,000, and that he left appellant as his widow, and said Belle S. James, and said nephews and nieces, and certain other persons therein named, as his heirs, legatees and devisees. Such petition asked that a purported will of Sandusky, dated June 19, 1939, be admitted to probate.

On August 25, 1941, appellant also filed in the probate court, in connection with such last petition, the

alleged antenuptial agreement and the marriage certificate hereafter referred to.

On October 4, 1941, Belle S. James, by leave of court, amended her petition by alleging in the amendment that appellant claimed to be but was not in fact the widow of decedent, and asking that the heirship of decedent be adjudicated. On the same date, appellant entered her appearance in the matter of the hearing of such petition as amended.

On February 2, 1942, a hearing was had on said two petitions, and the probate court entered an order admitting to probate such purported will dated August 20, 1934. Such order found that the purported will dated June 19, 1939, was not signed by Sandusky or by the alleged witnesses thereto, and denied probate thereof.

No appeal has been taken from such order.

The will of Sandusky dated August 20, 1934, so admitted to probate, was signed "Rochester Sandusky," as testator. It made no mention of appellant and did not refer to any marriage.

On March 10, 1942, the probate court entered an order finding that the decedent left his said sister and nephews and nieces as his sole heirs. From such order appellant appealed to the circuit court, where the hearing as to heirship was tried *de novo*.

On September 23, 1942, the circuit court entered an order which found that Sandusky and appellant were never married, that Sandusky was never married, and that he left surviving him such sister and nephews and nieces as his sole heirs.

This appeal is brought to review such last mentioned order.

The brief of appellant states that the petitioner, Belle S. James, made a *prima facie* case of nonmarriage by the evidence of J. T. McMillan, who testified that he was 88 years of age, that he married a sister of Sandusky and knew and was associated with

Sandusky since they were both small children, and that as far as he knew Sandusky was never married.

Thereupon appellant introduced in evidence an authenticated copy of a marriage license and of a certificate of the person performing a marriage ceremony under such license. Such license was dated February 8, 1934, was issued by the clerk of the county court of Christian county, Kentucky, and authorized the marriage of "R. Sandusky and Mrs. Iva Kidd." Such certificate of performance was dated February 8, 1934 and was signed by J. P. Watson. By said certificate Watson certified that he was a Methodist minister, and that on February 8, 1934, at Hopkinsville, Kentucky, under the authority of such license, he united in marriage "R. Sandusky and Mrs. Iva Kidd," in the presence of Mrs. P. E. Steger and Clark Steger. A photostatic copy of the original certificate of performance later introduced in evidence shows that no one signed such certificate of performance as a witness, but it also shows that the printed form had no place indicated thereon for the signature of a witness.

To prove the identity of the "R. Sandusky and Mrs. Iva Kidd" named in such license and certificate, appellant introduced in evidence the testimony of Madge McGrath, P. E. Steger and George H. Smith, each of whom testified to being present and witnessing the marriage ceremony.

Mrs. McGrath, a niece of appellant, lived in California at the time of the trial and her testimony was by deposition. She testified that she had known appellant and Sandusky since childhood; that while living in Chicago, Illinois, on February 7, 1934, about 9 p. m., she, with her two small children, left Chicago in the automobile of and with a Mr. and Mrs. Lawrence, of Chicago, bound for Kentucky, she intending to visit her father who lived near Corbin, Kentucky; that the Lawrences intended going to

Harlan, Kentucky, and were to drop Mrs. McGrath and the children off at Corbin; that they drove all night and on reaching Hopkinsville, Kentucky, about noon on February 8, 1934, had tire trouble; that the Lawrences then let Mrs. McGrath and the children out of the car and drove on to have the car repaired; that Mrs. McGrath and children walked along the street and came to a movie theatre, where they were looking at show posters when she looked up and saw appellant standing across the street; that she had never been in Hopkinsville before and did not know the name of the street; that she then ran to appellant, who was "shocked" at seeing her, as there was no previous appointment; that appellant then walked to a parked car which Sandusky had just gotten out of; that Mrs. McGrath then said to appellant, "What are you doing here?", and the latter replied, "We are going to get married"; that she and the children and Sandusky and appellant then went to the clerk's office in the courthouse; that after coming out of the clerk's office appellant stopped and talked to some woman who "kind of pointed," and Mrs. McGrath, her children, Sandusky and appellant then went to some real estate office to have the ceremony performed, where they met a man whom she thought was Steger, the "real estate man," who introduced himself when they went in and introduced Sandusky and appellant to his wife, Mrs. Steger, and to their son, and to Watson, the minister; that at the real estate office they also met her uncle, Turner Brown, who shook hands with Sandusky and appellant; that she thought Turner Brown was looking for work and "it seemed like he had business" in that office, — "he was just as surprised as I was"; that immediately after such ceremony Turner Brown left the group and the rest of them then went to a restaurant where they ate; that she and the children then left Sandusky and appellant and she did not thereafter see them; that

she then met the Lawrences on the street and they said they were going back to Chicago on account of the condition of the car; that she then learned she was clear across the State from Corbin, Kentucky, so they drove back to Chicago, arriving in Chicago the next morning.

P. E. Steger testified that he and Watson were partners in the real estate, loan and insurance business in Hopkinsville for several years; that Watson was also a Methodist minister and died in 1939. The witness was then shown several pictures of Sandusky and appellant which were admitted in evidence by agreement as being pictures of such parties. Steger then testified that the man and woman shown in such pictures were a couple that he saw married on February 8, 1934, in his office by Watson; that he, Steger, came into the office when Sandusky was handing the license to Watson; that he did not act as a witness, but sat down and saw and heard the ceremony; that Steger's wife acted as stenographer in the office and Watson asked her to fill out the return on the license, which she did, and while that was being done. Steger talked in ordinary conversational tones with Sandusky for from forty minutes to an hour, about trips to Florida and farming and things like that, and the couple then left; that this was the only time he saw decedent.

Smith testified that he had been sheriff of Christian county, Kentucky, for four years, and thereafter had been a constable for about twelve years; that at the time of the marriage he had no office, but generally sat around the courthouse, usually sitting in the hallway, and that he took special pleasure in looking after and directing strangers to offices. He was then shown such photographs and said he recognized the couple as being the Rochester Sandusky and appellant whom he saw married on February 8, 1934; that they were then strangers to him and were walking in the

hallway of the courthouse, and he asked them if he could assist them, and they told him that they were going to get a marriage license, so he took them to the clerk's office and waited in the hallway while the license was being obtained; that another woman with two little girls was with them; that Sandusky then told him he wanted a preacher, so he directed them to Watson's office where he saw them married, and that he did this as a matter of courtesy and without receiving any pay.

Smith also testified that he had no doubt he had been a witness at more weddings than any other one man in Hopkinsville, and recently "we have guided as many as fifteen couples a day" that wanted to get married; that one of the reasons he remembered the couple in question was because of the name "Sandusky," that he knew some other Sanduskys and asked Sandusky if there was any relationship, and that Sandusky replied he did not know.

To show declarations, in the nature of admissions, alleged to have been made by decedent as to his marital status, Evelyn Monroe, Mrs. Tables and Ralph Voyles testified for appellant.

Mrs. Monroe, of Chicago, testified she had known Sandusky and appellant for about seven years, first becoming acquainted with them in Florida; that after the first year she saw Sandusky in Florida every year for about seven years; that in 1939 Sandusky and appellant and the witness stayed at the Palmetto Inn, at Boca Grande; that appellant left for the north and about two or three days thereafter, in March, 1939, the witness met Sandusky in the hallway of the hotel; that on that occasion he asked her about appellant leaving, and asked her if she knew that they, meaning himself and appellant, had been married, and that she told him "Yes"; that Sandusky then told her he was going back to Danville to appellant's home and live there.

She further testified that she "guessed" that appellant was registered at the hotel, but had a separate room, and that appellant went by the name of Mrs. Kidd and not by the name of Mrs. Sandusky; that she visited Sandusky and appellant at the Kidd home in Central Park in the spring of 1939 and each spring thereafter.

Mrs. Tables testified that from June 1939, until June 1941, she helped appellant with the housework; that in 1940, when Sandusky and appellant were on the front porch and were joking, and did not know the witness was around, appellant asked Sandusky why he had married her, and he said, "Well, why did you marry me, for my money?", and that appellant then said, "Well, I haven't got it yet," — that "it was just a joke, they were joking about it." She further testified that was the only occasion she ever heard anybody say anything about marriage. She further testified that during such two years appellant cooked special dishes for Sandusky, put him to bed and helped him to dress, and that he treated her like a husband.

Ralph Voyles testified that he was a sexton at a cemetery in Danville wherein Sandusky had built a mausoleum; that on one occasion Sandusky told the witness that when he was put in the mausoleum some of the folks would be surprised. He further testified that Sandusky was buried in a single mausoleum.

Doctor Darroch testified that in 1939 Sandusky was injured and thereafter regularly came to the doctor's office for treatment, for his throat, bladder and prostate, being brought there by appellant and her daughter, Mary Jane Kidd; that Sandusky always wanted appellant to be present during the treatment, even at times when Sandusky was pretty well stripped; that appellant would instruct the doctor as to the treatments, and that on such occasions they treated each other like husband and wife.

Miss Long, a nurse, testified that in 1940 she was at appellant's for about one week, and during that time appellant gave Sandusky good care; that she noticed Sandusky and appellant were fond of and kissed each other; and that she knew appellant by the name of "Mrs. Kidd."

The foregoing is a fair statement of all the evidence offered or introduced by appellant.

The following is a fair statement of all the evidence admitted in rebuttal which we consider competent and material.

There was introduced in evidence a book containing the official record of the application for the marriage license in question. Blank places in the record were filled out by the deputy clerk immediately preceding the issuance of the license. Such application, so filled out, described "R. Sandusky" as then being aged 55 years, and Mrs. Iva Kidd as then being aged 49 years, and stated that Sandusky's residence was Gryehm, Kentucky, and that his occupation was that of a laborer.

A court reporter testified to the *verbatim* testimony of appellant in a proceeding had in the probate court on July 16, 1941, in the matter of the estate of Rochester Sandusky, an incompetent person, in which a citation had been issued against appellant. In such proceeding appellant testified that her name was Iva Kidd; that Sandusky was a very distant relative of hers, and came to her home in 1938 or 1939; that he was to pay her $10 a week for his board and washing; that he had just come back from Florida and had said he was coming to her house to stay. She was then asked whether she was ever married to Sandusky. On the advice of her attorney she at first refused to answer, but when the trial judge stated she would have to be committed for failure to answer, her attorney suggested that she answer, and she then said, "No. Mr. Sandusky asked me to be his wife." She was then asked where he asked her to be his

wife, and she replied that she couldn't just tell when and where.

The alleged antenuptial agreement dated February 7, 1934, hereinabove referred to was admitted in evidence over objection of appellant. It purported to bear the signatures of "R. Sandusky" and "Iva Kidd," and stated in substance that she agreed to marry him and provide him a home when he required a home; that he would not reveal the marriage agreement, and that she would not reveal the "marriage contract publicly" before his death.

Such alleged will dated June 19, 1939, was admitted in evidence over the objection of appellant. It purported to bear the signature of "R. Sandusky" as testator, and the signatures of two witnesses. Such alleged will stated that the testator gave to his wife, "Iva Kidd Sandusky," all of his personal property and certain real estate, and appointed his wife, "Iva Kidd Sandusky," executrix thereof.

On the trial of the present case in the circuit court the then attorney for appellant stated, "For the purpose of the record and in view of the court's other ruling, although we feel that none of this is competent, we are willing at this time . . . to stipulate for the purpose of the record in this case that such alleged antenuptial agreement and such will dated June 19, 1939" do not bear the signature of Rochester Sandusky or R. Sandusky, "preserving our general objection, which the court said he would hear us on later." He further stipulated that the alleged signatures of the two witnesses to such alleged will were not their genuine signatures.

It was shown that by deed dated December 12, 1938, appellant conveyed to a third party certain real estate in Vermilion county, which deed contained the recital that Mrs. Kidd was then a widow.

Mary Hafner testified that on January 4, 1941, she was the receiving clerk at the hospital at Danville at the time Sandusky was received as a patient at such

hospital; that in the hospital office the witness, in the presence of appellant filled out the blank form used by the hospital in registering patients; that in filling out such form she used and wrote in the blank places the information furnished her by appellant. This form as so filled out by the witness was then admitted in evidence. It stated on its face that the marital status of Sandusky was "Single," and that his nearest relative was his sister, Belle James.

Frank Roesch testified that he lived in Danville and knew Sandusky for about 70 years; that in the spring of 1939 appellant asked him to see if he could get Sandusky to come to her home, she saying she would take care of and keep Sandusky for $10 a week; that the two of them then went to see Sandusky, and appellant told Sandusky she would take him for $10 a week; that Sandusky said he would go if the witness would also go, so the next day the witness and Sandusky went to appellant's home, where the witness and Sandusky occupied the same bedroom from about May 1st to August 1st, 1939.

Mrs. LeRoy testified by way of deposition that she was the manager of the Palmetto Inn at Boca Grande and knew Sandusky since 1921, since which time he was a guest during each winter at such hotel; that in 1939, while Sandusky was ill, he stayed at such hotel; that appellant was also there for about two weeks, but Sandusky and appellant were not registered as man and wife and did not occupy the same room; that she never heard Sandusky call appellant his wife, and never heard appellant call him her husband; that one evening in 1939, when the witness was about 15 feet distant, she overheard a part of a conversation between Sandusky and appellant, in which appellant asked Sandusky to let her get a magistrate so they could get married. The witness testified that she did not hear Sandusky's reply.

Two grand nieces of Sandusky testified that Sandusky roomed and took his meals at their home

from 1929 to 1936. That in February 1934, he was not in good health, and that they did not miss him from any meal on February 8, 1934.

Two witnesses testified that Mrs. Kidd did not attend the funeral of Sandusky.

In reviewing this case we will disregard the proof of appellees that a portion of the marriage record at Hopkinsville has been destroyed by some unknown person, there being no evidence tending to show who destroyed the same.

The first contention of appellant is that inasmuch as Belle S. James alleged in her amended petition for probate of the will dated August 20, 1934, that appellant was never married to Sandusky, and prayed therein that the probate court ascertain and declare the heirship of Sandusky, it follows that the burden of proof was on Belle S. James to prove such non-marriage. We do not agree with this contention. A party is not required to make plenary proof of a negative averment. It is enough that he introduces such evidence as, in the absence of all counter testimony, will afford reasonable ground for presuming that the allegation is true; and when this is done the *onus probandi* will be thrown on his adversary. (*Vigus v. O'Bannon,* 118 Ill. 334; *Schmisseur v. Beatrie,* 147 Ill. 210.) It is our opinion that, under the circumstances of this case, there was no presumption of marriage, and the burden was on the appellant to establish the alleged marriage. (See *Gorden v. Gorden,* 283 Ill. 182; 38 C. J. 321.)

It will be noted that the marriage license and the certificate of marriage referred to "R. Sandusky." It will also be noted that the official records of the clerk's office in Hopkinsville, Kentucky, described such "R. Sandusky" as then being aged 55 years, and his residence as being Gryehm, Kentucky, whereas the Rochester Sandusky in question was then aged about 81 years and then resided in Danville, Illinois. Under these circumstances, it is our opinion that the

burden of proving identity was on the appellant. (*Bellinger v. Devine*, 269 Ill. 72; *In re Saunders*, 245 Ill. App. 423.) We do not consider as being in point such cases as *Schmisseur v. Beatrie, supra,* wherein it is said that the burden of proving the invalidity of a marriage is on the one asserting invalidity. In the present case, the fact and not the validity of the alleged marriage is questioned.

In attempting to explain why such record described "R. Sandusky" as being 55 instead of 81 years, appellant showed that the deputy clerk who actually issued the license and filled out the record was very deaf. Such deputy clerk testified but stated he had no memory of the particular couple. Inasmuch as the clerk saw both applicants at the time of making such record, the trial judge would be justified in not giving much weight to such explanation.

The case of the appellant is primarily and principally based on the testimony of Mrs. McGrath, P. E. Steger and George H. Smith. Necessarily, the testimony of the appellee is negative in character.

On cross-examination of Mrs. McGrath it was brought out that on January 10, 1941, she was divorced from McGrath, and a half hour later married one Grange; that she separated from Grange two weeks thereafter, since which time she and her former husband McGrath have been living in the same house, she intending to marry him when divorced from Grange. Although possibly true, it would seem unusual that on the day of the alleged marriage ceremony she would just happen to be in Hopkinsville, about 390 miles from her home in Chicago, meet her aunt on the street by chance and witness the alleged ceremony, and that her uncle, Turner Brown, who lived at Danville, which was about 270 miles distant from Hopkinsville, would also apparently by chance be present at the ceremony.

It will be noted that she testified, in effect, that the wedding group were directed to the Watson-

Steger office by some woman who pointed the way, while Smith testified he directed and accompanied the group to such office.

The witnesses Steger and Smith never saw Sandusky before or after February 8, 1934. There was nothing to again call their attention to the alleged marriage until after Sandusky's death seven years later. In the meantime Steger and Smith admittedly had witnessed a great many marriages by Watson.

Steger testified that on February 8, 1934, he noticed something wrong with Sandusky's right eye; that it did not move, but he, Steger, couldn't say whether the deceased had a glass eye; that it looked very peculiar. He also described Sandusky as being stooped a very little and stated that Sandusky seemed a little hard of hearing. By way of impeachment it was shown that on August 27, 1941, when interviewed by appellees' attorneys, Steger then stated that Sandusky was not stooped, had good eyesight and no peculiarities about his eyes and had good hearing. As a matter of fact the testimony of both sides shows that on February 8, 1934, Sandusky was somewhat stooped, had lost the use of one eye, that the lid of such eye drooped, that the defect in such eye was very noticeable and that Sandusky was then very deaf.

On cross-examination Smith stated that nothing had called his attention to this marriage from the time of the ceremony until a few weeks before the trial of the present case, when he was in the office of the marriage license clerk in Hopkinsville and then by chance overheard a Mr. Hardin (one of the attorneys for appellant in the trial court) talking with the clerk of the court, and overheard the name of Sandusky spoken by Hardin in connection with some lawsuit, and that he, Smith, before he was asked anything by Hardin, then stepped up to and told Hardin that he, Smith, evidently knew the couple in question; that he did not remember the name, but he talked to Hardin, and he testified "I did all I

could to assist him.'' Obviously, Smith was an unusual witness.

It is claimed by appellant that she and Sandusky were married for about seven years, yet she produced only the witnesses Monroe, Tables and Voyles to show any statement or conduct by Sandusky suggesting or indicating such marriage. Mrs. Tables helped with the house work in appellant's home practically all of the time while Sandusky lived there, yet the only conversation which she claims to have overheard indicating a marriage, was, she stated, a joking conversation. Mrs. Monroe was evidently very friendly to the appellant, and visited at appellant's home in 1939 and each spring thereafter. She also saw appellant and Sandusky in Florida. Mrs. Monroe testified to only one conversation indicating marriage. As to the testimony of Voyles that Sandusky told him that when he, Sandusky, was put in the mausoleum some of the folks would be surprised, we consider such statement to be of but little if any weight as indicating any marriage.

Sandusky and appellant, whatever their relations were in fact, never lived together publicly as husband and wife. As far as the record shows he never introduced her as his wife, she never introduced him as her husband, and they were not known or looked upon as husband and wife by their friends and neighbors. While in Florida they did not always stay at the same hotel, and when they did stay at the same hotel they never occupied the same room and did not register as husband and wife.

The failure of a litigant to call a witness within the control of such litigant is a proper subject of comment. (*Lebanon Coal & Machine Ass'n v. Zerwick,* 77 Ill. App. 486; *Zimmerman v. Zimmerman,* 149 Ill. App. 231, and *Consolidated Coal Co. v. Scheiber,* 167 Ill. 539.) It may be fairly open to doubt whether

this rule of law applies to the failure of appellant to call as witnesses Mrs. P. E. Steger, Clark Steger, her son, and Turner Brown, because it might be said that they were not under the control of the appellant, and it is because of this that we have disregarded the fact that such witnesses were not called to testify. However, we believe such rule of law properly applies to the failure of the appellant to call her daughter, Mary Jane Kidd, to testify as a witness. Mary Jane Kidd was a high school teacher. Apparently she lived in the home of appellant at all times after the alleged ceremony. Normally she would have known something about the true facts. We believe it is a reasonable inference that such daughter heard no admission by Sandusky, and saw no conduct between Sandusky and her mother, indicating marriage. When neither party calls an available witness, whatever presumption will be indulged in from the failure to call such witness, will be against the party to whose interest such witness would most likely incline, and failure to produce such witness is, in such case, a proper subject of comment. (*Zimmerman v. Zimmerman, supra.*)

Mrs. Kidd would have been a competent witness to testify as to her testimony in the probate court proceeding, and as to what she was alleged to have said to the receiving clerk at the hospital when Sandusky was received at the hospital, and as to any facts occurring after the death of Sandusky, such as her failure to attend the funeral (Ill. Rev. Stat., ch. 51, sec. 2 [Jones Ill. Stats. Ann. 107.068]) but she was not called as a witness. She did not deny or attempt to explain her testimony in the probate court that Sandusky was merely a boarder at her home, and that they were not married, and did not deny or attempt to explain the information given by her to the receiving clerk at the hospital, wherein she told the

receiving clerk in 1941 that Sandusky was then a single person and that his then nearest relative was his sister Belle James.

The only explanation now given by her counsel for her so testifying in the probate court is that Sandusky did not want his relatives to know of the marriage and that there was an antenuptial agreement between Sandusky and appellant that the marriage would be kept secret. The claim he did not want the marriage known, is a mere inference and not based on any direct testimony. As to an alleged antenuptial agreement, the record shows no such agreement in fact.

Appellant contends that the trial court erred in admitting in evidence such alleged antenuptial agreement and such alleged will, and erred in admitting proof as to the signatures on such instruments not being genuine, and in so doing argues that there is no evidence tending to show that the signatures on such instruments were forged, and that all of such evidence was incompetent and immaterial on the issue of heirship. We consider such evidence was competent and material. Whether such signatures were forged or how they were placed on such instruments, the fact remains that such instruments were filed in the probate court by the appellant in connection with her petition for admission to probate of the alleged will dated June 19, 1934, and appellant admits the signatures on such instruments were not genuine. By filing such instruments in the probate court the appellant vouched for their genuineness. Each instrument, if genuine, would have tended to prove the alleged marriage, and in the absence of any explanation, we believe it is reasonable to infer that each instrument was prepared by or with the approval of the appellant, and later filed in the probate court, for the purpose of proving the alleged marriage, so that she could get at least a substantial share of the estate of the decedent. The fabrication of evidence is calculated to raise a presumption against the party who has re-

course to such practice, not less than when evidence has been suppressed or withheld. (*Winchell v. Edwards,* 57 Ill. 41.)

It is our opinion that there was ample evidence in the record to justify the trial court in finding that the appellant and Sandusky were never married, and that Sandusky left Belle James, his sister, and certain nieces and nephews as his only heirs. Almost all of the evidence in this case was heard by the chancellor in open court. Where the chancellor receives the evidence in open court and sees the witnesses and hears them testify, he has a better opportunity for determining the weight and credit that should be given their testimony than does a court of review, and under such circumstances a court of review will not disturb the findings of the chancellor unless manifestly and palpably wrong, and this is true even though the court of review might be inclined to find otherwise had it been placed in the position of the trial court upon the trial of the case. (*Hall v. Pittenger,* 365 Ill. 135; *Widmayer v. Davis,* 231 Ill. 42.)

The judgment of the circuit court is affirmed.

*Affirmed.*