INTERMOUNTAIN BROADCASTING &
TELEVISION CORPORATION,
a corporation, Plaintiff,

v.

IDAHO MICROWAVE, INC., a corporation, Cable Vision, Inc., a corporation, and W. L. Reiher, Defendants.

KUTV, INC., a corporation, Plaintiff,

v.

IDAHO MICROWAVE, INC., a corporation, Cable Vision, Inc., a corporation, and W. L. Reiher, Defendants.

RADIO SERVICE CORPORATION OF

UTAH, a corporation, Plaintiff,

v.

IDAHO MICROWAVE, INC., a corporation, Cable Vision, Inc., a corporation, and W. L. Reiher, Defendants.

Nos. 3526–3528.

United States District Court
D. Idaho, S. D.
June 27, 1961.

Harold David Cohen and Pierson, Ball & Dowd, Washington, D. C.; Calvin W. Rawlings and Rawlings, Wallace, Roberts & Black, Salt Lake City, Utah, William H. Langroise, Langroise, Clark & Sullivan, Boise, Idaho, of counsel, for Intermountain Broadcasting & Television Corp.

George M. McMillan, Salt Lake City, Utah, for KUTV, Inc.

Harold David Cohen, Pierson, Ball & Dowd, Washington, D. C.; Gordon Burt Affleck, Salt Lake City, Utah, William H. Langroise and Langroise, Clark & Sullivan, Boise, Idaho, of counsel, for Radio Service Corp. of Utah.

C. G. McIntyre, Parry, Robertson & Daly, Twin Falls, Idaho, E. Stratford Smith, Smith & Pepper, Washington, D. C., George Schiffer, New York City, for defendants.

SWEIGERT, District Judge.

These three cases, involving identical issues of law, are before the Court upon motions for summary judgment made by the respective plaintiffs against common defendants, and upon the motion of defendant Reiher to dismiss the amended complaints for failure to state a claim against him.

Plaintiff in Civil Action No. 3528 is the Radio Service Corporation of Utah, a corporation organized under the laws of Utah, with its principal place of business in Salt Lake City, Utah.

Plaintiff in Civil Action No. 3527 is KUTV, Inc., a corporation organized under the laws of Nevada, with its principal place of business in Salt Lake City, Utah.

Plaintiff in Civil Action No. 3526 is Intermountain Broadcasting and Television Corporation, a corporation organized under the laws of Utah, with its principal place of business in Salt Lake City, Utah.

Defendants Idaho Microwave, Inc., and Cable Vision, Inc., are corporations organized under the laws of Idaho. Defendant Reiher is a citizen of Idaho. The amount in controversy exceeds the jurisdictional requirement of $10,000, and jurisdiction is based upon the diversity statute, 28 U.S.C. § 1332.[1]

The record in these cases consists of the pleadings and various affidavits filed by the respective parties in connection with the plaintiffs' motions for summary judgment.

The question presented is whether these defendants, engaged in the operation of a so-called community antenna service in Twin Falls, Idaho, through defendant Cable Vision, Inc., may, without the consent of these plaintiffs, pick up and convey their signals through facilities to be constructed by defendant Idaho Microwave to the community antenna system of defendant Cable Vision for distribution by the latter to its subscribers in Twin Falls. The question, in legal terms, is whether such conduct of defendants is an infringement of any interest, legal or equitable, which these plaintiffs may have in their broadcasts.

Plaintiffs, contending that there is such infringement, seek declaratory and injunctive relief.

So far as this Court is aware, the question here presented is one of first im-

---

1. Plaintiffs in these actions have neglected to allege the principal place of business of defendants Idaho Microwave, Inc., and Cable Vision, Inc., as required by 28 U.S.C. § 1332(c). From our knowledge of the case, we believe that they may do so without destroying diversity jurisdiction. Formal amendments will, therefore, be required properly alleging the citizenship of these corporations

pression and of great importance in the field of television. Community antennae systems, similar to defendants' operations, have appeared in such increasing number that they now serve 700 communities in more than 40 states at an investment cost in excess of $100,000,000 and with a viewing public of more than two million subscribers. (See, generally Defendants' Brief in Opposition to Plaintiffs' Motions for Summary Judgment, p. 14).

### The Facts

It appears from the record without significant controversy that plaintiff in Civil Action No. 3528, Radio Service Corporation of Utah, sometimes referred to as Salt Lake, KSL-TV, owns and operates television Station KSL-TV, which operates Channel 5 in Salt Lake City under authorization of the Federal Communications Commission.

It has purchased, installed and constructed television broadcast equipment and facilities at its studios in Salt Lake City, Utah, and at its transmitter site in the Oquirrh Mountains, about eighteen miles from Salt Lake City. The value of its broadcast equipment, facilities and transmitter is in excess of $1,000,000. Its expenditures for the operation, maintenance and repair of this equipment, including the cost of electrical energy necessary to operate it, are in excess of $15,-000 per month, exclusive of depreciation, interest and administrative expenses. (Affidavit of Jay W. Wright, par. 3).

This plaintiff assembles and broadcasts over station KSL-TV about 110 hours of programs each week. These programs range in content from entertainment, news and special events to educational, religious, agricultural and public service programs. Plaintiff produces some of these programs by the efforts of its own employees and the use of its own or rented equipment. It obtains other program material, network broadcasts, by contract arrangement with Columbia Broadcasting System and other programs, motion picture films, by rental arrangement with film distributors. (Affidavit of Jay W. Wright, pars. 4 and 5).

Plaintiff has contracts with ASCAP and BMI, and similar organizations under which royalties, syndication fees and license fees are paid to those groups for the right to broadcast certain material over station KSL-TV. (Affidavit of Jay W. Wright, par. 6).

Plaintiff alleges that the arrangement and "blending" of its locally produced programs with rented films, network shows and other programs for broadcast over its transmitting facilities, requires the exercise of the creative skill of its staff and the expenditure of large amounts of money. (Affidavit of Jay W. Wright, par. 7).[2]

Twin Falls, Idaho, 200 air miles away from the Salt Lake City transmitter of KSL-TV, is located at too great a distance to receive a dependable signal from plaintiff's Salt Lake station. However, this plaintiff has an arrangement with station KLIX-TV, Twin Falls, whereby KLIX-TV picks up the Columbia Broadcasting Company network broadcasts of KLS-TV at a point outside of Twin Falls for rebroadcast over the facilities of station KLIX-TV to the Twin Falls area. In return for plaintiff's consent to this practice, the owner of station KLIX-TV pays plaintiff $3.85 per hour for the use of KSL-TV's signal. These payments aggregated $5,290.71 for the first eight months of 1959.

The record shows that Station KLIX-TV, Twin Falls, itself, has an agreement with Columbia Broadcasting Company (and also American Broadcasting Company and National Broadcasting Com-

---

2. The Affidavit of Reiher, par. 9, contends that the plaintiff is merely an electrical conduit between the sponsor and the public, and makes no creative effort whatsoever, outside of the sale of local advertising. We do not treat this dispute as raising an issue of fact, since we consider the question of "creativity" to be merely an aspect of the legal question concerning the existence of property rights. There seems to be no factual dispute as to the actual operation of plaintiff station.

pany), which gives it the right to use these network programs. But, because the transcontinental circuits do not reach Twin Falls, KLIX-TV has made this arrangement with KSL-TV, Salt Lake.

Plaintiff KUTV, Inc., (Action No. 3527), sometimes referred to herein as Salt Lake, KUTV, owns and operates television station KUTV, broadcasting out of Salt Lake City under authorization of the Federal Communications Commission. Its factual situation is substantially similar to that of Salt Lake, KSL-TV, except that it is an affiliate of the American Broadcasting Company and for reasons similar to those of KSL-TV, has an arrangement with Twin Falls, KLIX-TV, whereby the latter picks up the American Broadcasting Company network broadcasts of KUTV for rebroadcast over the facilities of KLIX-TV to the Twin Falls area. In return for that plaintiff's consent, KLIX-TV pays $3.85 per hour for the use of the KUTV signal.

Plaintiff Intermountain Broadcasting and Television Corporation (Action No. 3526, sometimes referred herein as Salt Lake, KTVT), owns and operates television station KTVT out of Salt Lake City under authorization of the Federal Communications Commission. Its factual situation is substantially similar to that of the other two plaintiffs except that it is an affiliate of the National Broadcasting Company and for reasons similar to those of the other two plaintiffs has a similar arrangement with Twin Falls, KLIX-TV, whereby the latter picks up the National Broadcasting Company network broadcasts of KTVT, Salt Lake, for rebroadcast over the Twin Falls area. In return for that plaintiff's consent, KLIX-TV pays $5 per hour for the use of the KTVT signal.

The defendant Cable Vision, Inc.'s business may be described as follows: It now maintains two high-gain receiving antennae on towers about 125 feet above ground and at a relatively high location in the vicinity of Twin Falls to receive signals of stations which are dependable at that location, but which would not be receivable in adequate quality in Twin Falls.

Its equipment enables it to, and it does, select from among signals which reach its site, those which it wishes to carry to its customers. These selected signals are amplified, demodulated and otherwise electronically treated and regenerated, and, in some instances, they are converted to different channels (or different frequencies) than those on which they are transmitted by the originating station.

The selected broadcasts are now delivered by defendant Cable Vision, Inc., from its receiving antennas down to the homes of its subscribers in the City of Twin Falls by means of coaxial cable. "Drop-lines" are run from the cable to the individual homes of the subscribers and connections are wired directly to the back of the subscribers' television sets. Subscribers are charged a fee (approximately $100) for the initial hook-on to the system and a recurring charge which varies but is approximately $4–$5 per month. (Affidavit of J. C. Theisen, par. 3; Affidavit of Hal Merrill, par. 3).

At the present time, Cable Vision, Inc.'s antennas are located and designed, to select from the available signals which reach the site, the broadcasts, not of the three plaintiffs herein, but of three Idaho stations—station KBOI-TV, Channel 2, Boise, Idaho; KTVB, Channel 7, Boise, Idaho; and also the local broadcasts of KLIX, Twin Falls, Idaho, which is the Twin Falls station that has consent arrangements with the three plaintiffs. None of these broadcasting stations are parties to these actions.

Recently, defendant Cable Vision, Inc., and Idaho Microwave Inc., both controlled by defendant Reiher, have announced plans to construct additional facilities to pick up and convey the signals of the three plaintiffs herein at points some distance from Twin Falls and to bring them by means of microwave relay to the cable facilities of Cable Vision, Inc., and thence to residents of Twin Falls in the manner above described.

Defendants have engaged in the solicitation of subscribers for this new and added community antenna service and have publicly announced that they will make plaintiffs' broadcasts available to subscribers as soon as the microwave service is placed in operation.

Defendants deny any obligation on their part to obtain the consent of, or to account to, the plaintiffs for picking up and so distributing plaintiffs' broadcasts in this manner.

### Justiciable Issue

Although the parties in their final briefs, do not urge the point, we have considered the preliminary question whether the pending cases in their present posture present a justiciable issue for purposes of declaratory relief.

It appears from a stipulation, filed November 23, 1960, that defendant Idaho Microwave, Inc., filed its applications with the Federal Communications Commission on May 18, 1958, requesting authorization to construct and operate the additional microwave facilities which defendants expect to use to carry out their plans.

The applications (which were made under provisions of the Federal Communications Act, applicable to common carriers engaged in communication by wire or radio, subchapter II, 47 U.S.C.A. §§ 201–222, rather than to broadcasting stations, subchapter III, 47 U.S.C.A. §§ 301–386, (Affidavit of Reiher, pp. 2–3) ), were granted by the Commission on December 22, 1959, with public notice thereof on December 29, 1959.

Thereafter, the KLIX Corporation, on January 28, 1960, filed a protest to the granting of these applications and a petition to reconsider, pursuant to Sections 309(c) and 405 of the Act, as amended. The Commission denied the petition for reconsideration on February 17, 1960, but granted the protest to the extent of designating the applications for further hearing on specified issues and providing that the previous action granting the applications be stayed pending final decision by the Commission after hearing.

The stipulation further discloses that the further administrative hearing was scheduled to be held on December 12, 1960. No representations have been made to the Court by the parties in these actions whether the hearing was ever held, or, if it was, what resulted therefrom.

We assume, therefore, as shown by the record, that the application of Idaho Microwave stands as granted subject to a stay which temporarily prevents it from constructing its microwave facilities pending further administrative hearing which may result either in revocation of the present permit or denial of the protest.

Of course, if the administrative agency should ultimately set aside its prior authorization, the defendant Cable Vision, Inc., would be unable to convey the signals of the plaintiffs' stations to its subscribers by means of microwave relay facilities of defendant Idaho Microwave, Inc.

It does not follow, however, that this possibility renders the present controversy between the parties hypothetical.

It appears from the record that defendants may accomplish their announced purpose by means other than microwave relay, e. g., privately owned cables, or cables owned by an intrastate carrier— means outside the sphere of federal control, a possibility stressed by defendants' counsel at oral argument (Tr. 76–78) where counsel intimated a purpose to proceed with the community antenna system by any available means.

Although defendants are temporarily stayed from their announced plan of operating by means of facilities of Idaho Microwave, Inc., their objective and their plan pose an unmistakably clear and present threat.

Overt actions have been taken by defendants in furtherance of their announced purpose—publicity, solicitation of customers and a permit application obtained though subject to further hearing.

The question is not whether judicial relief should be withheld until adminis-

trative remedies have been exhausted because the pending administrative application would not in any event determine the question in controversy between the parties to this action.

The Federal Communications Commission has disclaimed any power under the existing statute, to control community antenna systems with respect to the kind of projected activity which defendants threaten and of which plaintiffs complain.

Nor are any of the parties to this action, except applicant Idaho Microwave, Inc., parties to the administrative proceeding.

Station KLIX, whose protest has caused the stay by the Commission, and which presumably alone controls it, is not a party to these actions, though it is a licensee of these plaintiffs.

The constitutional limitation of Article III, Section 2, extending the federal judicial power only to a "case or controversy" applies to the Declaratory Judgment which, itself, authorizes relief only in a "case of actual controversy," 28 U.S.C. § 2201. Aetna Life Insurance Co. of Hartford, Conn. v. Haworth, 1937, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617.

■ To warrant a grant of declaratory relief there must, of course, be "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." Aetna Life Insurance Co. of Hartford, Conn. v. Haworth, supra, 300 U.S. at page 240, 57 S.Ct. at page 464. See, e. g., Hayburn's Case, 1792, 2 Dall. 409, 1 L.Ed. 436.

The danger to the plaintiff must be present, not contingent on the happening of hypothetical future events, and the prejudice to his position must be actual and genuine, not merely possible or remote. Borchard, Declaratory Judgments, 56 (2d ed. 1941). Cf. Public Service Commission of Utah v. Wycoff Co., 1952, 344 U.S. 237, 243, 73 S.Ct. 236, 97 L.Ed. 291.

The question in each case is whether the facts alleged show that there is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. Maryland Casualty Co. v. Pacific Coal & Iron Co., 1941, 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826.

It may be that in the situation of these cases that any stay of Idaho Microwave, Inc.'s application would be a factor for the Court's consideration in connection with the granting or terms of any injunctive relief.

■ However, for the reasons set forth, the Court is of the opinion that there is here presented a proper case for declaratory relief in any event. The issue is not only present and real, but also hotly and ably contested. To refuse relief would only prolong the dispute and the uncertainty of the parties in their operations and plans.

### The Case on the Merits

We turn now to a consideration of the cases upon the merits of plaintiffs' motions for summary judgment.

Plaintiffs do not rely upon any right to protect program content under statutory copyright. Further, plaintiffs concede that the question whether plaintiffs have a common law copyright in the programs—which they themselves create, is a subsidiary issue.

This subsidiary issue of possible common law copyright in particular programs, is not sufficiently documented in the affidavits now on file to justify a determination of the point at this time by summary judgment. More detailed identification and description of those particular programs in plaintiffs' claim of common law copyright, would be required— their mode of creation, production and arrangement, and attachment of all contracts pertaining to these programs and the rights of plaintiffs therein.

Plaintiffs state that the main issue on their motion for summary judgment is not whether plaintiffs have a copyright interest under statute or common law,

but whether plaintiffs' broadcasts, regardless of program content or copyright, can be picked up without their consent in the manner and for the purpose already described. (Plaintiffs' Reply Brief, p. 13, Civil Action No. 3528).

Pointing out the elements of cost, labor and skill, which are necessary to arrange and broadcast television programs over their facilities, plaintiffs assert that the announced and threatened practice of defendants amounts to a misappropriation of the fruits of plaintiffs' money, skill and labor, and is "unfair competition" and "unjust enrichment" within the meaning of International News Service v. Associated Press, 1918, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, and other cases which have followed and applied that case. (See Plaintiffs' Opening Brief, pp. 7–17, Civil Action No. 3528).

In the International News Service case, strongly relied upon by plaintiffs, the parties were competitors in the gathering and distribution of news for their members to publish in newspapers for sale to the public. The Associated Press gathered its news throughout the world at substantial expense by means of its widespread personnel and facilities and wrote and edited it for the use and benefit of its members. International News Service, engaged in the identical business, resorted to the practice of copying news from bulletin boards and early editions of Associated's member newspapers to provide it to its own members either bodily or re-written.

The Court, noting that news, itself, as distinguished from the literary quality thereof, would not be a proper subject of copyright, approached the case upon the theory of unfair business competition.

Recognizing the right of any person to spread news for any legitimate purpose, the Court, nevertheless, concluded that such a right in the public did not mean that International News Service could pick up news for commercial use in competition with Associated Press, the gatherer of the news; that the right of the gatherer of news to control the use of it to that extent is not abandoned by its

first publication; that the misappropriation of another's product for use as one's own is a sufficient basis for equitable relief and that the element of "palming off", although often present, is not essential to the doctrine of unfair competition.

Justice Holmes, in a separate concurring opinion, agreed that "palming off" was not an essential ingredient of unfair competition but took the view that the only ground of complaint on the part of Associated which could be recognized without legislation, was the implied misstatement of International to the effect that it had itself gathered the news, and its failure to give the credit for it to Associated.

Justice Brandeis, in a strong dissent, took the position that mere appropriation without cost, and use for profit of products, ideas or values created by others does not constitute unfair competition unless the manner of the competition involves fraud or force or other unlawful acts or purposes, such as misrepresentation in the "palming off" of defendants' goods as those of plaintiff, or some breach of contract or trust or inducement thereof. In his view there was nothing legally objectionable in the means by which International took news from public postings or news columns, nor in the manner of its use of such news.

Justice Brandeis did, however, recognize that the law of unfair competition encompassed situations beyond the typical one of "palming off" and made unanimous the Court's determination that "palming off" was not essential to recovery. The basis of his dissent was, rather, that Courts should refrain from recognizing so-called property rights, which had hitherto not been afforded protection, in fields where the public interest may be affected.

Although the International News case is undoubtedly a leading one in the field of unfair competition, it was an enunciation of so-called federal common law made prior to Erie Railroad Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, which held that in diversity cases, decision must rest, not upon any

federal common law, but upon applicable state law, both decisional and statutory.

International News Service therefore, is no longer controlling in diversity cases, and its relevance to the pending diversity cases depends upon the extent to which the Courts of Idaho, where the practices of defendants occur, have adopted or would adopt its doctrine.

Neither the parties, nor the Court, has been able to discover any precedent in the laws of Idaho upon the question presented in the pending cases. In Cazier v. Economy Cash Stores, 1951, 71 Idaho 178, 228 P.2d 436, the Idaho Supreme Court, dealing with the deceptive use of trade names, recognized general principles of unfair competition and approvingly cited Nims On Unfair Competition, (3rd Ed. 1929), Section 9(a), p. 36, containing a reference to the International News case with respect to the "palming off" aspect of that case.

The most that can be inferred from the Idaho decision is that the Idaho Court apparently has recognized the broadened definition of unfair competition accepted by all the Justices in International News. Whether or not the Idaho Court would go further and adopt the majority opinion in the International News case to the extent of applying its rationale to the facts of the pending cases is however, doubtful.

In International News, the majority expressly stated that its purpose was, not to give the Associated Press a monopoly or to give it the right to prevent, without complying with the copyright laws, reproduction of its news articles, but only to postpone participation by a competitor in the process of news distribution and then only to the extent necessary to prevent International from "reap[ing] where it ha[d] not sown". [248 U.S. 215, 39 S.Ct. 72]

The concurring opinion of Justice Holmes suggests, and the dissenting opinion of Justice Brandeis stresses the difficulties inherent in attempts by the Courts to extend the concept of property rights in such manner as to curtail the free use of products, knowledge and ideas in fields not covered by statutory or common law copyright.

Justice Brandeis readily grants that the capacity of the unwritten law for growth has often, and for the most part wisely satisfied new demands for justice by invoking analogies or extending a rule or principle, especially where the problem is relatively simple, as it is apt to be when private interests only are involved. But, he cautions that, with the increasing complexity of society, as for example, the great development of agencies furnishing country-wide distribution of news, the public interest tends to become omnipresent and problems presented by new demands for justice cease to be simple.

Noting that resort to legislation has latterly been had with increasing frequency, Justice Brandeis observes that the creation or recognition by Courts of new private rights may work serious injury to the general public unless the boundaries of the right are definitely established and wisely guarded.

"Courts" he says, "are ill-equipped to make the investigations which should precede a determination of the limitations which should be set upon any property right in news or of the circumstances under which news gathered by a private agency should be deemed affected with a public interest. Courts would be powerless to prescribe the detailed regulations essential to full enjoyment of the rights conferred or to introduce the machinery required for enforcement of such regulations. Considerations such as these should lead us to decline to establish a new rule of law in the effort to redress a newly disclosed wrong, although the propriety of some remedy appears to be clear." 248 U.S. at page 267, 39 S.Ct. at page 82.

Mainly for these reasons, many courts have refused to extend the doctrine of International News Service beyond the unique factual circumstances there presented. See: National Comics Publications v. Fawcett Publications, 2 Cir., 1952, 198 F.2d 927; Cheney Bros. v.

Doris Silk Corp., 2 Cir., 1929, 35 F.2d 279, certiorari denied 1930, 281 U.S. 728, 50 S.Ct. 245, 74 L.Ed. 1145; Triangle Publications v. New England Newspaper Pub. Co., D.C.D.Mass.1942, 46 F.Supp. 198.

Commentators have, likewise, urged a limited application of the International News case. See: 2 Callman, The Law of Unfair Competition and Trademarks, 883 (2d Ed. 1950); Chafee, Unfair Competition, 53 Harv.L.Rev. 1289 (1940); Warner, Radio & Television Rights, (1953).

Those courts which have followed and applied the doctrine of International News Service have done so in identical fact situations. (See: Associated Press v. KVOS, Inc., 9 Cir., 1935, 80 F.2d 575, reversed on jurisdictional grounds, 1936, 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183; Veatch v. Wagner, D.C.D.Alaska 1953, 116 F.Supp. 904), or in cases where there was manifest unjust enrichment, for example, where rights in private enterprises or events for which the investor had granted exclusive TV or Radio licenses were involved—unique situations in which the primary purpose of an investor to charge the public for the privilege of watching an event, would be frustrated or defeated through exhibition by others than itself or its exclusive licensee. (See: Pittsburgh Athletic Co. v. KQV Broadcasting Co., D.C.W.D.Pa.1938, 24 F.Supp. 490; Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., 1950, 199 Misc. 786, 101 N.Y.S.2d 483, affirmed 1951, 279 App.Div. 632, 107 N.Y.S.2d 795; Twentieth Century Sporting Club, Inc. v. Transradio Press Service, 1937, 165 Misc. 71, 300 N.Y.S. 159; Mutual Broadcasting System, Inc. v. Muzak Corp., 1941, 177 Misc. 489, 30 N.Y.S.2d 419.

No such exclusive license rights are relied upon by plaintiffs on these pending motions. The existence of possible exclusive license with respect to particular programs is not sufficiently documented to justify a determination of that point by summary judgment.

Where no such exclusive license feature has appeared, injunctive relief upon an unfair competition theory has been refused. See: National Exhibition Co. v. Teleflash, Inc., D.C.S.D.N.Y.1936, 24 F. Supp. 488.

A cautious approach to recognition of novel rights protectible upon the theory of unfair competition is especially wise when the unjust practice complained of occurs in a field over which the Congress has already assumed a control sufficient to enable it, if it so chooses, to regulate the practice one way or another in the public interest.

The Federal Communications Act of 1934, as amended, 47 U.S.C.A. § 151 et seq., was adopted for the stated purpose of regulating interstate and foreign commerce in communication by wire and radio, which includes television, so as to make available, so far as possible, to all the people of the United States, a rapid, efficient, nationwide and world wide wire and radio communication service with adequate facilities at reasonable charges, (47 U.S.C.A. § 151); further, to provide for the use of interstate and foreign radio channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by federal authority—no such license to be construed to create any right beyond the terms, conditions and periods of the license. (47 U.S.C.A. § 301).

Thus, there has been a plenary exercise by Congress of the power to occupy and regulate the field of television. Allen B. Dumont Laboratories v. Carroll, D.C.E.D. Pa.1949, 86 F.Supp. 813.

In Sec. 325(a) of the Act, the Congress has already dealt with a practice substantially similar to the practice of defendants in the pending cases by providing that no broadcasting station shall rebroadcast the programs, or any part thereof, of another broadcasting station without the express authority of the originating station.

All parties to the pending cases concede that this section of the Act, as presently written, does not apply to the

practice of these defendants for the sole reason, however, that the practice of defendants does not technically constitute "rebroadcasting" within the meaning of the Act which now defines broadcasting as "the dissemination of radio communications intended to be received by the public, directly or by the intermediary of relay stations." (47 U.S.C.A. § 153 (o).

Defendants here do not disseminate the programs which they pick up by antenna from plaintiffs' broadcasts by "radio communications intended to be received by the public." Defendants disseminate the picked up broadcasts by means of microwave and cable directly to the receiving sets of their subscribers.

It has, therefore, been considered by the Federal Communications Commission, that community antennae services, operating as defendants here, are not engaged in "broadcasting" or "rebroadcasting" within the meaning of the Act as presently written. (Report and Order in Docket No. 12443, Inquiry Into the Impact of Community Antenna Systems, TV Translations, TV "Satellite" Stations and TV "Repeaters" On the Orderly Development of Broadcasting, 18 Pike & Fischer, Radio Regulation, 1573, 1600–01, pars. 62–65 (1959).

Nevertheless, just how substantially similar are the operations of defendants here to operations which have been held bound by Sec. 325(a) is apparent in the light of C. J. Community Services, Inc. v. F. C. C., 1957, 100 U.S.App.D.C. 379, 246 F.2d 660. In that case a nonprofit corporation operated a so-called "booster station"—an amplifier which picked up the signals of two Spokane broadcasting stations and radiated or "boosted" them in the air so they could be received by home receiving sets in Bridgeport, Washington, which otherwise could not have received them because of obstructing topography. The Court and the Commission recognized that such an operation came within the definition of broadcasting (Sec. 153(o) and was, therefore, a "rebroadcasting" of programs within the meaning of Sec. 325(a).

The 86th Congress considered proposals to amend Sec. 325(a) of the Act to require community antenna services, operating as defendants here, to obtain consent to pick up the programs of an originating station. Such proposed amendment was neither adopted nor favorably reported.

In its report, the Senate Committee on Interstate and Foreign Commerce (Senate Report No. 923, P. 11, 86th Cong., 1st Sess. (1959) ) noted that the basic issue between community antenna operators on the one hand, and broadcasters and their suppliers on the other, has never been resolved, namely, the question whether the former are appropriating the latters' programs or infringing on any property rights therein.

The Committee also noted the pendency of lawsuits involving the question.

This Senate report stated, however, that the Committee wished to make "crystal clear" that it did not intend in recommending legislation to extend the jurisdiction of the F.C.C., to include community antenna systems, or to affect in any way whatever private rights as might have existed prior to the enactment of the recommended bill, stating:

> "No such inference should be drawn because of the failure to apply Section 325(a) which would require the community antenna system to obtain the consent of the originating station nor should any such inference be drawn which may have an effect on any private lawsuit by the inclusion or exclusion of any language in this legislation."

It may be noted here, as already indicated, that the Federal Communications Commission, even without any amendment of Sec. 325(a), now has jurisdiction over the microwave facility of defendant Microwave, Inc., under the common carrier by wire or radio provisions of the Federal Communications Act (Subchapter II, 47 U.S.C.A. §§ 201–222) under which the permit to that defendant was applied for and granted.

With this judicial and legislative background in mind, this Court has considered whether the factual situation presented on this motion falls within the rationale of the International News Service case and such cases as have followed and applied it, and whether plaintiffs herein have any property right, quasi or otherwise, or any other protectible interest in their broadcasts which are being infringed by the practice of defendants.

■ We have concluded that there are basic differences between the present situation and that involved in International News Service—differences so basic that in our opinion this Court should not, and the Idaho Courts would not, even if they accepted the rationale of that decision as applied to its own fact situation, hold that plaintiffs here have any property right, quasi or otherwise, in their broadcasts, considered apart from such program content as might be protectible under statutory or common law copyright, which is being infringed by the practice of defendants or which is entitled to protection.

In the first place, Associated Press and International News Service were identical businesses engaged in the keenest competition to supply news to their respective members for sale to the public, a competitive factor which the majority opinion considered in its discussion of misappropriation.

In the pending cases the plaintiffs and the defendants are not engaged in the same kind of business. They operate in different ways for different purposes.

Plaintiffs are in the business of selling their broadcasting time and facilities to the sponsors to whom they look for their profits. They do not and cannot charge the public for their broadcasts which are beamed directly, indiscriminately and without charge through the air to any and all reception sets of the public as may be equipped to receive them.

Defendants, on the other hand, have nothing to do with sponsors, program content or arrangement. They sell community antenna service to a segment of the public for which the plaintiffs' programs were intended but which is not able, because of location or topographical condition, to receive them without rebroadcast or other relay service by community antennae. Any profit to defendants must come from the public for this service.

The practice of International News Service interfered with the primary purpose of Associated Press and its members in the sale of its gathered news, first or fresh, to the paying public, while in the pending cases the practice of defendants does not interfere with any such primary purpose of plaintiffs.

Plaintiffs may expend money, labor and skill to arrange, blend and broadcast programs over their broadcast facility. This is necessary to maintain the physical plant and operation by means of which plaintiffs broadcast the network programs which they receive from the national networks and the film which they rent from film distributors. They also arrange and produce some programs of their own in order to comply with the variety and local interest requirements of the Federal Communications Commission under which they hold their licenses. See: Simmons v. F. C. C., 1948, 83 U.S. App.D.C. 262, 169 F.2d 670; N. B. C. v. United States, 1943, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344.

In the International News Service case the Court recognized that no one should be permitted to reap the fruits of another's expenditure of money and skill. Assuming that plaintiffs' expenditure of money and skill for its purposes is fairly comparable with the gathering, writing and editing of news releases by the widespread personnel and facilities of Associated Press, there is, however, a basic difference in the two situations which must be borne in mind in connection with the question whether defendants practice here is an unfair misappropriation of the fruits of plaintiffs' expense and skill.

In the International News Service case, [248 U.S. 215, 39 S.Ct. 72] Associated expended its money and skill to

gather news and to make it "salable by [the] complainant for money" to the newspaper purchasing public. International News Service appropriated that news for the purpose of merchandising it in identical manner to the same newspaper purchasing public "precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not * * *."

In the pending cases, however, defendants' practice does not amount to interference at the point where plaintiffs' profit is to be made. Certainly, defendants' practice does not interfere with plaintiffs' profits derived from sponsors. On the contrary, the practice may enhance plaintiffs' possibilities of profit in that field by extending the reception of plaintiffs' programs.

Further, in International News, a misrepresentation was involved, not "palming off", but an implied misrepresentation by International that its news, based in fact upon Associated sources, had been gathered by itself—an element of deception which the majority opinion and the separate concurring opinion of Holmes, J., recognized. Defendants here make no claim, either expressly or impliedly, to their service subscribers of having themselves produced the programs which are relayed. On the contrary, defendants relay the programs as program broadcasts of the plaintiffs and so identified.

Further, International News Service picked up Associated's news, when it was still so first or fresh as to have commercial value, from early editions of Associated's member newspapers in the Eastern United States, and wired it to the Western United States in such manner that it appeared in western editions of International's members simultaneously with the editions of Associated's members and sometimes earlier. No such unique modus operandi or time factor is here involved. Defendants' microwave and cable relay plaintiffs' broadcasts to reception sets for appearance thereon, not only in the same manner, but at the same time as was intended by plaintiffs themselves.

The real, and it seems to the Court, the only claimed interference here involved is interference by defendants with plaintiffs' asserted right to charge for any rebroadcast or other relay of their broadcasts—a purpose which is, not only subordinate to, but inconsistent with plaintiffs' primary purpose and function as a broadcasting station.

Plaintiffs, asserting such a right, have made arrangements with a television broadcasting station, KLIX-TV, Twin Falls, Idaho, whereby that station, with the consent of plaintiffs, picks up plaintiffs' network broadcasts for rebroadcast in the Twin Falls area and pays plaintiffs an agreed compensation for that consent.

The Twin Falls station makes these payments to plaintiffs notwithstanding that it has its own arrangements with the national networks permitting use of their programs, arrangements which, however, cannot be carried out only because the transcontinental circuits do not reach Twin Falls. Hence, the arrangement with these three plaintiffs.

Plaintiffs allege that KLIX, the local Twin Falls station, will not continue to pay plaintiffs for their rebroadcast consents if the defendants are also permitted to pick up plaintiffs' broadcasts for microwave relay to Twin Falls receiving sets, and that plaintiffs' income from that source will be reduced or cut off.

This argument, however, begs the very question here involved, namely, whether plaintiffs, apart from statutory or common law copyright or exclusive license rights, have a property right, quasi or otherwise, in their broadcasts, as such, sufficient to support a requirement of consent before either rebroadcast by KLIX, Twin Falls or microwave relay by defendants.

Such a property right cannot be established or inferred from the mere fact that plaintiffs may have successfully asserted it with KLIX-TV, Twin Falls.

The Twin Falls Station, which is a broadcaster and, therefore, a re-broadcaster, within the meaning of Sec. 153 (o), is required by Sec. 325(a) to obtain plaintiffs' consent before rebroadcast of the programs and, presumably, is willing to pay to get that consent.

But, the statutory requirement (Sec. 325(a) ), of consent before rebroadcast is not based upon, or intended to recognize any property right of the originating station in its broadcast signal as such. It was designed only as a means for safeguarding the interests of such persons as might have property rights in program content which would be protectible under established law, as, for example, statutory or common law copyright or exclusive license arrangements protectible under the doctrine of unfair competition.

That such was the limited purpose of Congress in its enactment of the rebroadcast-consent provision appears from the Federal Communications Commission's administrative interpretation with which we agree, to the effect that the purpose of the provision was to protect the rights of those having property rights in program content. (See: Pike & Fischer, Radio Regulation, 91:1134–35).

The Commission there notes that, at the time Congress first acted in the matter, the beneficiary of this protection was normally the station whose broadcast signal was involved, but that since the original enactment of the rebroadcast-consent provision, conditions have changed, in that today (1952) the station whose signal is rebroadcast frequently does not own the property rights in its programs and none of the stations in a network may own the property rights in program material. The Commission points out that, since Sec. 325(a) does not purport to alter or define the property rights in program material, in some cases the consent given under the section may be of little value as authority for the rebroadcast of a program because of the station's lack of authority to give consent to a third party for the use of someone else's

property. For this reason, the Commission notes that Sec. 325(a) may no longer adequately reflect present conditions or effectively carry out the original intent of Congress and that amendment of the Section or its repeal so far as it pertains to rebroadcasts, is a matter requiring legislative action.

That such was the limited, regulatory purpose of the broadcast-consent requirement of Sec. 325(a) is evident from the Commission's further administrative interpretation with which the Court agrees, to the effect that, if an originating station refused to grant such consent, the Federal Communications Commission could deal with any unreasonable refusal under its existing power to grant or withhold the broadcasting license of the originating station according to the Commission's view of the public interest. (See: Pike & Fischer, Radio Regulation 91:-1134–35).

We conclude, therefore, that the consent and payment arrangement which these plaintiffs have with KLIX, Twin Falls, is not a solid base upon which to rest, in whole or in part, their claim of unfair competition.

Turning to another aspect of the pending question, the Court notes that plaintiffs concede that individual owners of receiving sets in the Twin Falls area, or groups of such owners, could, without infringing on any rights of plaintiffs, construct their own antenna of sufficient height, location and design to pick up the plaintiffs' broadcasts and bring them to their home receiving sets. The fact that owners, unable or unwilling to undertake the difficulties and expense of such construction, prefer to use the similar antenna service provided by defendants does not change the essential situation.

Defendants' antenna service facility is simply a more expensive and elaborate application of the antenna principle needed for all television reception. It does not otherwise differ from what the owners could do for themselves.

Nor does the fact that the owners are willing to pay for such a service facility change the essential situation. The test for purposes of determining unfair competition is, not whether defendants are paid for their service or whether, as appears in this case, they expect to realize a profit. The true test is whether any such profit is one which under the circumstances rightfully belongs to plaintiffs so as to make it a misappropriation by defendants.

Let us assume for the purpose of discussion, that the owners of home TV sets in Twin Falls, chose to form a non-profit cooperative to construct facilities identical with those planned by defendants. Certainly, the owners could do collectively, through a non-profit cooperative, what each one of them could admittedly do for himself. The Court does not believe that the mere profit-purpose of defendants' rendition of an identical service to the owners would transform the operation into unfair competition with plaintiffs.

It is true that in the International News Service case, the Court, speaking of the relationship between the public, International News Service and Associated, said that, admitting the right of the purchaser of a single newspaper to spread knowledge of its contents gratuitously for any legitimate purpose not unreasonably interfering with plaintiffs' right to make merchandise of it, the transmission of that news for commercial use, in competition with complainant, would be a different matter.

In the pending cases, however, for the reasons above set forth, the Court is of the opinion that the relationship between the public, defendants' microwave relay and plaintiffs' broadcasts are not similar to or fairly comparable with the relationships in the International News case.

## Conclusion

1. For the reasons herein set forth, the motions of plaintiffs in these three actions for summary judgment should be denied.

Plaintiffs, upon further presentation, may make a case for protection under copyright law, statutory or common law, with respect to any programs which they themselves creatively produce or for protection under the doctrine of unfair competition with respect to any exclusive license arrangements which have heretofore been recognized as ground for invoking that doctrine.

2. The motions of defendant Reiher to dismiss these complaints as to him upon the ground that the complaints fail to state a claim against him should also be denied.

The amended complaints allege, upon information and belief, that defendant Reiher owns the controlling interest in and generally controls the operation of defendant Cable Vision, Inc. Further, the complaints directly allege that defendant Reiher owns the controlling interest in and generally controls the activities of the defendant Idaho Microwave, Inc.; that defendant Reiher, together with defendant Cable Vision, Inc., have publicly and privately announced their intention to expand and operate a community antenna system in the manner heretofore described. Upon these allegations, we believe that defendant Reiher is a proper party defendant, and that these complaints state a claim against him.

3. Lastly, with respect to the motion to substitute parties and amend caption, filed December 21, 1959, in Civil Action No. 3526, pursuant to the provisions of Rule 25(c), Fed.R.Civ.P., 28 U.S.C.A., the Court is of the opinion that the original party-plaintiff, Intermountain Broadcasting & Television Corporation, (KTVT), should remain in the case until further order, and that Columbia Pictures Electronics Co., Inc., organized under the laws of Delaware with its principal place of business in New York, be added as an additional party plaintiff.

4. Plaintiffs will prepare amended complaints in these actions setting forth the principal places of business of Idaho Microwave, Inc., and Cable Vision, Inc.,

to be filed prior to the entry of the formal orders herein.

5. Defendants will prepare an order in accordance with this opinion and in conformity with the Rules of this Court.