(No. 57145.—

THE BOARD OF TRADE OF THE CITY OF CHICAGO, Appellant, v. DOW JONES & COMPANY, INC., Appellee.

*Opinion filed October 21, 1983.*

SIMON, WARD and MORAN, JJ., dissenting.

Kirkland & Ellis, of Chicago (James M. Amend, Robert G. Krupka, G. Christian Kronberg and Michael S. Walsh, of counsel), for appellant.

Lawrence Gunnels, of Reuben & Proctor, of Chicago, and Patterson, Belknap, Webb & Tyler, of New York (Robert D. Sack, Thomas C. Morrison, Robert P. LoBue and Donald A. Baer, of counsel), for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendant, Dow Jones & Company, Inc., appealed from the judgment of the circuit court of Cook County entered in favor of plaintiff, the Board of Trade of the city of Chicago, in its action for declaratory judgment. Plaintiff sought a declaration that its offering of a commodity futures contract utilizing the Dow Jones Industrial Average as the underlying commodity would not vi-

olate defendant's legal or proprietary rights. The appellate court reversed (108 Ill. App. 3d 681), and we allowed plaintiff's petition for leave to appeal (87 Ill. 2d R. 315).

The opinion of the appellate court adequately sets forth the facts, and they will be restated here only to the extent necessary to discuss the issues. Defendant, a Delaware corporation with its principal office in New York City, publishes the Wall Street Journal, Barrons, a weekly business magazine, and the Asian Wall Street Journal. It also maintains the Dow Jones News Service, through which it distributes financial news to subscribers. It produces several stock market indexes, the Dow Jones Industrial Average, Transportation Average, and Utilities Average, which are computed on the basis of the current prices of stocks of certain companies selected by defendant's editorial board.

The financial news furnished by defendant is disseminated in a variety of ways. It is distributed to brokerage houses, banks, financial institutions, individual investors, and others who are interested in stock market news. This information is transmitted to teleprinters, cathode-ray-tube receivers, and other devices, such as wall displays in brokerage houses. Subscribers desiring the averages can extract them from the news service or arrange with defendant to deliver the averages directly to them by teleprinter. Through special contracts, others receive the averages through entities which are licensed by defendant to sublicense the distribution of the averages. Plaintiff has a "Subscription Agreement" under which it pays defendant for its News Service and is allowed to compute and display the Dow Jones Averages on plaintiff's trading floor on a continuous, "real time" basis.

Plaintiff is the oldest and largest commodities exchange market in the United States. It was organized in 1848, and in 1859 the General Assembly granted plain-

tiff a special charter which incorporated it as a not-for-pecuniary-profit organization. Over the years plaintiff has added different types of futures contracts and now offers these contracts in a variety of fields, including agricultural products, precious metals and financial instruments. All commodities exchanges in the United States are regulated by the Commodities Futures Trading Commission (CFTC), and no exchange may trade a futures contract until the CFTC approves the futures contract and designates the exchange as a contract market for that contract.

A futures contract is a contract traded on a commodities exchange which binds the parties to a particular transaction at a specified future date. A stock index futures contract is a futures contract based upon the value of a particular stock market index. Dr. James H. Lorie, stipulated by the parties to be an expert, called by plaintiff, testified that these contracts have been traded since February 1982. At the time of trial they were traded on the Kansas City Board of Trade based on the Value Line Average, on the Chicago Mercantile Exchange based on the Standard & Poor's 500 Stock Index and on the New York Futures Exchange based on the New York Stock Exchange Composite Index. He stated that their "overriding purpose is the management of risk." Unlike other futures contracts, no underlying commodity exists to be delivered at the future date, but rather the transaction is settled by the delivery of a certified promissory note in lieu of cash. He explained that the total risks of investing in the stock market are divided into two parts. One part is the "nonsystematic risk," which occurs when an individual company encounters problems such as strikes, changing consumer attitudes or other problems which would devalue that company's stock. "Nonsystematic risk" can be controlled by an investor through the use of a diversified portfolio. The other type of risk is "system-

atic risk," which is the risk associated with the broad general movements of the stock market as a whole. Diversification of one's stock portfolio will not provide protection against sharp declines in the stock market. He explained that there are only two ways to protect against systematic risk. The most direct way is for an investor to sell his stocks. This method is rather costly because of the transactional costs in selling and buying stocks, such as brokerage fees. Additionally, if capital gains are realized, the transaction becomes even more costly. The second method of protecting against systematic risk is to deal in stock market futures contracts. This method is more efficient, Professor Lorie explained, since an investor holding a hypothetical $100,000 portfolio could purchase two futures contracts in the Chicago Mercantile Exchange for one-fifteenth the cost of selling his stocks.

An investor who holds a diversified stock portfolio may "hedge" against systematic risk by entering into a stock index futures contract predicting that the market index would decline. Dr. Lorie testified that this was the most effective method of "hedging" of which he was aware.

Plaintiff, desiring to be designated as a contract market for stock index futures contracts, devoted more than two years to developing its own index to be used as the basis for its stock index futures contract. During the greater part of this period, the Securities and Exchange Commission (SEC) and the CFTC were in a dispute concerning which agency had jurisdiction to regulate stock index futures contracts. In December 1981, the two Federal agencies agreed on the scope of their respective jurisdiction and on recommendations to Congress for regulatory legislation. They agreed that the CFTC would regulate trading in stock market index contracts and that such trading would be permitted only if the con-

tracts were based on widely known and well-established stock market indexes. This jurisdictional agreement effectively precluded CFTC approval of a contract based on the index developed by plaintiff.

On February 26, 1982, plaintiff submitted an application to the CFTC asking that it be designated as a contract market for Chicago Board of Trade Portfolio Futures Contracts. The application proposed the use of three indexes, the stock market index, transport index, and the electric index portfolio contracts. It was explained:

> "Each index covers a significant portion of the overall stock market. The stock market index covers industrial firms, the Transport Index covers air, rail, and trucking firms, and the Gas and Electric Index covers utility companies. This division is similar to the way other major market indices divide the stock market."

No mention of the Dow Jones name appeared in the application, but the stocks used in each of the indexes were identical to those used in the Dow Jones averages. In a draft proposal to the CFTC for trading "CBT indexes," the Dow Jones averages stock lists were cut out of the Wall Street Journal and pasted into the proposals. The CFTC advised plaintiff that the CBT indexes were not just similar to, but were identical to the Dow Jones averages and that this should be explicitly stated in its application. On May 7, 1982, plaintiff amended its application to state that the CBT indexes were identical to Dow Jones averages and that when Dow Jones changed a component stock or revised the divisor, plaintiff would make the same change so that the CBT indexes would remain identical to the Dow Jones averages. Plaintiff also added a disclaimer to the application disclaiming any association with Dow Jones. On May 13, the CFTC approved plaintiff's use of the stock market index portfolio contract, but did not rule concerning the use of the transportation or utility index portfolio contracts.

The circuit court held that the burden of producing evidence and the burden of persuading the trier of fact fell upon defendant, and found that defendant had a "property right and valuable interest in the Dow Jones averages" but that plaintiff's use of the averages in the manner proposed did not violate those rights. The order, however, required that there be imprinted upon the CBT index contract a disclaimer disavowing any association with or sponsorship by defendant, Dow Jones. The appellate court reversed, holding that plaintiff had the burden of production and persuasion, and that plaintiff's use of the averages constituted commercial misappropriation "of the Dow Jones index and averages."

Prior to review of the substantive issues we consider a matter of procedure. Plaintiff contends that the appellate court erred in holding that plaintiff bore the burden of proof of the allegation in its complaint that "by offering the commodity futures contract described in paragraph 4, the Board of Trade will not violate any legal or proprietary right of Dow Jones." Citing *In re Estate of Sandusky* (1943), 321 Ill. App. 1, *Hecht v. Hecht* (1977), 49 Ill. App. 3d 334, *Shumak v. Shumak* (1975), 30 Ill. App. 3d 188, and *Levine v. Pascal* (1968), 94 Ill. App. 2d 43, it argues:

"Settled law states the proper rule—the party asserting rights has the burden of proof, and the party alleged to violate those rights who files a declaratory judgment action, is not required to prove a negative."

We do not agree with plaintiff's contention.

The factual situations in those cases are clearly distinguishable. In *Sandusky* the negative averment was that a decedent had never been married; in *Levine* the negative averment concerned an unperfected security interest; *Hecht* and *Shumak* involved allegations in divorce complaints that mental cruelty was without provocation. *Sandusky* holds only that one alleging the negative need not make plenary proof; he need only introduce such evidence as will, in the absence of counter testimony, afford reason-

able ground for presuming the allegation is true and the burden shifts to his adversary. *Hecht* and *Shumak* involve issues unique to the type of action involved; *Levine* follows a general statement in *Sandusky* and is not authority for plaintiff's position.

Although this court has not considered the specific question, the rule is well stated in *International Hotel Co. v. Libbey* (7th Cir. 1946), 158 F.2d 717, 721:

> "When an issue of fact is tendered by the complaint and denied by the answer, the plaintiff must prove its complaint, even though it is a complaint for a declaratory judgment."

Plaintiff argues that the appellate court's holding erroneously expands the tort of misappropriation and that its decision contravenes public policy. Citing *Capitol Records, Inc. v. Spies* (1970), 130 Ill. App. 2d 429, *Metropolitan Opera Association v. Wagner-Nichols Recorder Corp.* (199 Misc. 786, 101 N.Y.S.2d 483, *aff'd* (1951), 279 A.D. 632, 107 N.Y.S.2d 795, *Standard & Poor's Corp. v. Commodity Exchange, Inc.* (2d Cir. 1982), 683 F.2d 704, and *International News Service v. Associated Press* (1918), 248 U.S. 215, 63 L. Ed. 211, 39 S. Ct. 68, plaintiff argues that competitive injury is a fundamental prerequisite essential to a finding of misappropriation. It argues that the facts of this case are analogous to *National Football League v. Governor of Delaware* (D. Del. 1977), 435 F. Supp. 1372, and *Loeb v. Turner* (Tex. Civ. App. 1953), 257 S.W.2d 800, in which the courts refused to find misappropriation because, *inter alia*, the parties were not in competition with each other. It argues that it has done nothing immoral or unethical but has merely created a "new product" which is "outside the primary market which the producer of the original product originally set out to satisfy ***." (See J. Rahl, *The Right to "Appropriate" Trade Values*, 23 Ohio St. L.J. 56, 62-63 (1962).) Finally, plaintiff argues that the appellate court's decision is against public policy in that it grants what amounts to a common law patent monopoly to

defendant which permits it to exclude others from using its product for any purpose "regardless of whether the producer is being injured or intends to exploit the product itself."

Defendant responds that the tort of misappropriation should be flexible so that, by carefully tailoring their misappropriation to avoid the strict rules of the tort, "enterprising pirates" cannot avoid the application of the doctrine. Citing *Sims v. Mack Truck Corp.* (3d Cir. 1979), 608 F.2d 87, 95, *cert. denied* (1980), 445 U.S. 930, 63 L. Ed. 2d 764, 100 S. Ct. 1319, defendant argues that under the doctrine of misappropriation direct competition is not essential to tort liability. Defendant argues that plaintiff seeks to exploit defendant's reputation for accuracy and impartiality without compensating it for its good will. Finally, in response to plaintiff's argument that the appellate court's opinion is against public policy, defendant argues that the appellate court's opinion is consistent with public policy in that it maintains the incentive for the creation of intellectual property. Defendant argues that if its rights in the averages are not protected, there will be a diminished incentive for it to continue to provide the averages. Defendant points out that it does not seek to monopolize the production of stock indexes and that plaintiff is free to develop its own, but that it desires to protect its rights in the averages which it created and continues to produce.

None of the many cases cited by the parties presents facts sufficiently similar to serve as definitive authority for the decision of the issue presented here. The rationales applied in developing a basis for the tort of misappropriation appear to be as diverse as the factual situations out of which the issues in those cases arose.

The doctrine of misappropriation as a form of unfair competition was first enunciated by the Supreme Court in *International News Service v. Associated Press* (1918), 248 U.S. 215, 63 L. Ed. 211, 39 S. Ct. 68. In that case, INS

was copying news stories from bulletin boards of members of AP and transmitting the fresh news contained on those bulletin boards to its own members. Thus, INS could obtain information collected by AP at great expense and transmit this information to its midwestern and west coast members, who could then print the news at the same time as the competing AP members or, in some instances, earlier. In affirming the decree enjoining the practice the majority opinion suggested that without the revenues derived from this exclusive, timely presentation of the news, AP or other news services would not have sufficient incentive to continue performing their services. 248 U.S. 215, 235, 63 L. Ed. 211, 219, 39 S. Ct. 68, 71; see *Developments In The Law: Competitive Torts*, 77 Harv. L. Rev. 888, 934 (1964).

The tort of misappropriation was recognized in Illinois for the first time in *Capitol Records, Inc. v. Spies* (1970), 130 Ill. App. 2d 429. There the defendant purchased records and magnetic tapes sold by the plaintiff and recorded them on magnetic tapes. He then sold these re-recordings to his customers. A disclaimer was placed on the cassette tapes disclaiming any relationship between the defendant and plaintiff or the recorded artists. Defendant was able to sell his product at a lesser price than plaintiff since he avoided the costs of contracting with the performers, producing the master recordings, paying royalty fees, and advertising. Relying on the rationale of *Schulenburg v. Signatrol, Inc.* (1964), 50 Ill. App. 2d 402, 411-12, *affirmed in part and reversed in part* (1965), 33 Ill. 2d 379, the court reasoned that the manner of competition was "unfair" since the defendant was able to compete on equal terms by avoiding those costs normally associated with producing such recordings. (130 Ill. App. 2d 429, 434-35.) Underlying the court's reasoning is the premise that the plaintiff's pecuniary reward for producing its intangible product would be severely reduced if other competitors could avoid production costs by merely waiting until a re-

cord became popular and then recording the work for resale.

Competing with the policy that protection should be afforded one who expends labor and money to develop products is the concept that freedom to imitate and duplicate is vital to our free market economy. (*Kellogg Co. v. National Biscuit Co.* (1938), 305 U.S. 111, 83 L. Ed. 73, 59 S. Ct. 109; *Intermountain Broadcasting & Television Corp. v. Idaho Microwave, Inc.* (D. Idaho 1961), 196 F. Supp. 315, 322; J. Rahl, *The Right to "Appropriate" Trade Values*, 23 Ohio St. L.J. 56, 72 (1962); *Developments In the Law: Competitive Torts*, 77 Harv. L. Rev. 888, 937 (1964).) Indeed, when the doctrine of misappropriation was first enunciated, Justice Brandeis recognized this competing policy:

> "He who follows the pioneer into a new market, or who engages in the manufacture of an article newly introduced by another, seeks profits due largely to the labor and expense of the first adventurer; but the law sanctions, indeed encourages, the pursuit." (*International News Service v. Associated Press* (1918), 248 U.S. 215, 259, 63 L. Ed. 211, 229, 39 S. Ct. 68, 79 (Brandeis, J., dissenting).)

Similarly, Professor Rahl reasons:

> "Substantial similarity of alternatives can come about in only one of two ways—by independent development or by imitation. While there are many instances of simultaneous independent innovation, our economy would still be in the Dark Ages if this were the only circumstance under which competing alternatives could be offered. Imitation is inherent in any system of competition and it is imperative for an economy in which there is rapid technological advance." Rahl, *The Right to "Appropriate" Trade Values*, 23 Ohio St. L.J. 56, 72 (1962).

In balancing the factors that should determine which of the competing concepts should prevail, it appears unlikely that an adverse decision will cause defendant to cease to produce its averages or that the revenue it currently re-

ceives for the distribution of those averages will be materially affected. Defendant correctly asserts that it will lose its right to prospective licensing revenues in the event that in the future it elects to have its name associated with stock index futures contracts, but reliance upon the existence of a property right based upon the ability to license the product to prospective markets which were not originally contemplated by the creator of the product is somewhat "circular." *Williams & Wilkins Co. v. United States* (Ct. Cl. 1973), 487 F.2d 1345, 1357 n.19; see *Metropolitan Opera Association, Inc. v. Wagner-Nichols Recorder Corp.* (N.Y. S. Ct. 1950), 101 N.Y.S.2d 483, 493; *Developments In the Law: Competitive Torts*, 77 Harv. L. Rev. 888, 935 (1964).

Alternatively, holding that plaintiff's use of defendant's indexes in the manner proposed is a misappropriation may stimulate the creation of new indexes perhaps better suited to the purpose of "hedging" against the "systematic" risk present in the stock market.

Whether protection against appropriation is necessary to foster creativity depends in part upon the expectations of that sector of the business community which deals with the particular intangible. If the creator of an intangible product expects to be able to control the licensing or distribution of the intangible in order to profit from his effort, and similarly those who would purchase the product expect and are willing to pay for the use of the intangible, a better argument can be made in favor of granting protection. (See generally Rahl, *The Right to "Appropriate" Trade Values*, 23 Ohio St. L.J. 56, 61-69 (1962).) The record shows that the plaintiff sought to develop its own index prior to the CFTC's requirement that the contracts be based on well-known, well-established indexes. It then offered defendant 10 cents per transaction, which it estimated would be somewhere between $1 million and $2 million per year, for the use of its name and averages. While

there appears to be some dispute as to whether this offer of payment was primarily for the use of defendant's name or for the use of the averages, the offer of money is relevant to the extent that it acknowledges the value of the association of defendant's name and good will with the averages it produces.

To hold that defendant has a proprietary interest in its indexes and averages which vests it with the exclusive right to license their use for trading in stock index futures contracts would not preclude plaintiff and others from marketing stock index futures contracts. The extent of defendant's monopoly would be limited, for as defendant points out, there are an infinite number of stock market indexes which could be devised. As one commentator notes, the effect of granting a "monopoly" at the base of the production pyramid is much less objectionable than granting a monopoly at the top of the pyramid:

> "Social cost assumes more manageable size and so less significance near the base of the pyramid. Exclusive rights in a special kind of typewriter key are far less objectionable than a monopoly in the lever, because far less is swept into the monopolist's control." *Developments In the Law: Competitive Torts*, 77 Harv. L. Rev. 888, 938 (1964).

We conclude that the possibility of any detriment to the public which might result from our holding that defendant's indexes and averages may not be used without its consent in the manner proposed by plaintiff are outweighed by the resultant encouragement to develop new indexes specifically designed for the purpose of hedging against the "systematic" risk present in the stock market.

We have considered plaintiff's contention that defendant has failed to prove that the proposed use of the averages would cause it injury. The publication of the indexes involves valuable assets of defendant, its good will and its reputation for integrity and accuracy. Despite the fact that plaintiff's proposed use is not in competition with the use

defendant presently makes of them, defendant is entitled to protection against their misappropriation.

Plaintiff contends that the subscription agreement into which the parties had entered allows it to use the Dow Jones Averages in its stock market index futures. The subscription agreement provides:

> "We hereby subscribe to the Dow Jones NEWS SERVICE *** and agree to make advance payment each month of your monthly charges, as follows:
>
> — A NEWS SERVICE Charge for use of the NEWS SERVICE by exchange personnel only at the above address, or
>
> — A NEWS SERVICE Charge for use of the NEWS SERVICE by exchange personnel at the above address and for a display of the NEWS SERVICE at a location accessible to the trading floor members, and ***."

Plaintiff argues that the appellate court's limitation of the term "use" modifies the contract in that it adds the phrase "informational use only." It contends that the term "use" is not ambiguous and thus reference to extrinsic evidence was improper. Alternatively, it argues that because the stock index futures contracts use only the averages as a reference point, its use of the averages constitutes "informational use." Defendant responds, citing *Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, and other authorities, that the language contained in the contract must be interpreted in light of the entire contract. Defendant argues that when the term "use" is viewed in the context of a news wire subscription agreement, it cannot be interpreted to include plaintiff's proposed use.

We agree with the appellate court that the terms of the subscription agreement do not grant plaintiff the right to use the averages as the basis of its stock index futures contract. Words derive their meaning from the context in which they are used, and the contract must be viewed as a whole "by viewing each part in light of the others." (*La Throp v. Bell Federal Savings & Loan Association* (1977),

68 Ill. 2d 375, 381.) We are of the opinion that the granting of the right to use the information contained in the news service does not include the right to use the Dow Jones Industrial Average as a basis of stock index futures contracts but assuming, *arguendo*, that the contract is in this sense ambiguous, we agree with the appellate court's analysis of this issue.

For the reasons stated, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

JUSTICE SIMON, dissenting:

The majority opinion fairly identifies the general approach to the common law tort of misappropriation. In order to determine whether that tort will lie we must balance Dow Jones' interest in preventing the use of its average by the Board of Trade against society's interest in the widest use and dissemination of intellectual property. Obviously, both interests are important and require fair consideration in the balancing process. Unless the creators of intellectual property have some protection against the appropriation of their ideas by others they will be discouraged from producing them; on the other hand, unless society can demand that the owners of intellectual property allow it to be appropriated by people who have developed novel and productive uses for it, the pace of innovation will slow.

I would allow the Board of Trade to use the Dow Jones Averages for its stock market futures contracts. The majority errs, in part, because it has failed to place enough emphasis on the unfettered access to ideas in the public domain, a privilege which is essential to our free market economy. The majority also fails to take heed of the warning of Justice Brandeis:

"Courts are ill-equipped to make the investigations which should precede a determination of the limitations which should be set upon any property right ***. Courts

would be powerless to prescribe the detailed regulations essential to full enjoyment of the rights conferred, or to introduce the machinery required for enforcement of such regulations. Considerations such as these should lead us to decline to establish a new rule of law in the effort to redress a newly-disclosed wrong, although the propriety of some remedy appears to be clear." *International News Service v. Associated Press* (1918), 248 U.S. 215, 267, 63 L. Ed. 211, 232-33, 39 S. Ct. 68, 82 (Brandeis, J., dissenting).

In deciding this case, the majority has broadly expanded the tort of misappropriation in Illinois. I believe that to the extent that intellectual property rights are to be expanded beyond their common law limits, it would be better to leave the matter to Congress, with which direction over the development of intellectual property rights is lodged under the Constitution (U.S. Const. art. I, sec. 8, cls. 3, 8), and to the State legislature. Both legislative bodies are well equipped to conduct the investigations necessary to determine what conditions and limitations should be put on such rights. I fear that the majority opinion offers little guidance to the courts and bar in Illinois on how to apply this greatly expanded tort in other circumstances.

The common law tort of misappropriation has been limited to cases where intellectual property, lawfully obtained, is used in direct competition with the person who created it. This requirement was implicitly adopted by a majority of the United States Supreme Court in *International News Service v. Associated Press* (1918), 248 U.S. 215, 63 L. Ed. 211, 39 S. Ct. 68. In that case the Associated Press sought to prevent INS from taking, and retransmitting by wire, information previously transmitted over the AP wire service and published in the early editions of newspapers subscribing to the AP service. In holding that INS was unlawfully misappropriating AP's intellectual property the Supreme Court carefully stated that the evil of INS's practice was that it enriched itself by using information ac-

quired from the AP wire services in direct competition with AP:

> "The right of the purchaser of a single newspaper to spread knowledge of its contents gratuitously, for any legitimate purpose not unreasonably interfering with [AP's] right to make merchandise of it, may be admitted; but to transmit that news for commercial use, in competition with [AP]—which is what [the INS] has done and seeks to justify—is a very different matter. In doing this [the INS], by its very act, admits that it is taking material that has been acquired by [AP] as the result of organization and the expenditure of labor, skill, and money, and which is salable by [AP] for money, and that [INS] in appropriating it and selling it as its own is endeavoring to reap where it has not sown, and by disposing of it to newspapers that are competitors of [AP's] members is appropriating to itself the harvest of those who have sown. *Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of [AP's] legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not; with special advantage to [INS] in the competition because of the fact that it is not burdened with any part of the expense of gathering the news.* (Emphasis added.) (248 U.S. 215, 239-40, 63 L. Ed. 211, 221, 39 S. Ct. 68, 72-73.)

In keeping with this requirement of a demonstration of competitive injury, the decree entered in the *INS* case prohibited INS only from using the information in AP wire service reports " '*until its commercial value as news to the [AP] and all of its members has passed away.*' " See 248 U.S. 215, 245, 63 L. Ed. 211, 223, 39 S. Ct. 68, 75.

The competitive-injury requirement adopted by the Supreme Court in *INS* has been followed and applied in many of the cases discussing the tort of misappropriation. (See, *e.g., Standard & Poor's Corp. v. Commodity Exchange, Inc.* (2d Cir. 1982), 683 F.2d 704, 711; *National Football League v. Governor of Delaware* (D. Del. 1977), 435 F. Supp. 1372, 1377; *Time, Inc. v. Bernard Geis Associates*

(S.D.N.Y. 1968), 293 F. Supp. 130, 146; *Metropolitan Opera Association v. Wagner-Nichols Recorder Corp.* (1950), 199 Misc. 786, 101 N.Y.S.2d 483, 498-99, *aff'd* (1951), 279 A.D. 632, 107 N.Y.S.2d 795; *Loeb v. Turner* (Tex. Civ. App. 1953), 257 S.W.2d 800.) This requirement was accepted as a part of Illinois law in *Capitol Records, Inc. v. Spies* (1970), 130 Ill. App. 2d 429, where the appellate court held that Spies could not tape record Capitol's musical recordings and sell them in direct competition with Capitol's records and tapes. The competitive-injury requirement has a sound basis in policy, for it allows the tort of misappropriation to protect the creators of intellectual property against actual injury to their business, but at the same time it allows for suitable reward for people who develop novel uses for information and ideas that are freely obtained from the public domain.

In this case the circuit court found that Dow Jones would not suffer any competitive injury if the Board of Trade used the Dow Jones index for its futures contracts. Its finding was set forth in the following language: "The Board of Trade will not compete with Dow Jones and will not interfere with Dow Jones' ability to make a profit. Dow Jones is essentially in the News Publication business. The Chicago Board of Trade is in the Commodities Futures Trading Business." Moreover, the circuit court decree ensured that Dow Jones' good will would not be diminished through the Board of Trade's use of the index. The circuit court's decree required that all contracts, advertising, and promotional activity relating to the Board of Trade's stock market futures index contain express disclaimers of any sponsorship or association with Dow Jones.

Dow Jones claims that it will suffer the loss of future licensing revenues if we hold that the Board of Trade may freely use the Dow Jones' index in its futures contracts. At trial, however, Dow Jones pleaded and presented testimony claiming that it had no interest or expectation in li-

censing its name or index for use in stock market futures. Even if Dow Jones changed this position in the future, nothing in the circuit court decree would prevent it from licensing its name to sponsor a stock market futures index in competition with the one to be offered by the Board of Trade. Moreover, as the majority opinion admits, it is somewhat circular to base a finding of competitive injury on the ability to license the index to prospective markets when those licenses have no value unless we find in this action that Dow Jones has a property right in its index under the tort of misappropriation. See 98 Ill. 2d at 120.

Dow Jones has no more than an inchoate interest in the Board of Trade's use of its index, but the majority's opinion converts that interest into a property right. The majority is swayed by what it sees as "unjust" enrichment—the Board of Trade's plan to earn a profit by the free use of an idea developed by Dow Jones at considerable cost. I do not regard this use as "unjust" in the least. The Board of Trade proposed to use information that Dow Jones had freely allowed the public to acquire in a business that Dow Jones has not shown the slightest interest in pursuing. If "unjust enrichment" has become the only element for the tort of misappropriation in Illinois, I fear that there will be few commercial ideas and little information left in the public domain. I view the proper elements of the tort of misappropriation to be a combination of unjust enrichment and competitive injury. Although the former feature may be present in this case, neither the majority opinion nor Dow Jones reveals where to find the latter feature.

WARD and MORAN, JJ., join in this dissent.