In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-1840

MINNESOTA LIFE INSURANCE COMPANY

*Plaintiff,*

*v.*

ARLENE KAGAN,

*Defendant-Appellee,*

*v.*

TAMMY KAGAN, et al.,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:10-cv-06003—**Ruben Castillo**, *Judge.*

ARGUED OCTOBER 24, 2012—DECIDED JULY 31, 2013

Before POSNER, WOOD, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.*

## I

An unexpected death can often unite family members in their grief, bringing them closer together and helping

them to overlook previous differences. But for the Kagans, an unexpected death in 2009 seemed to have just the opposite effect, fueling the flames of an already burning feud among family members. The decedent, Allen Kagan, suffered a fatal heart attack while doing yard work on December 2, 2009, after years of heart problems and a prior open-heart surgery. Allen left behind a wife of three years, Arlene, as well as three adult children from a previous marriage, Tammy, Scott, and Richard. At the time of Allen's death, Tammy and her children lived with Allen and Arlene, and the tensions resulting from three generations plus a step-mother living under the same roof appear to be the source of the present family feud. According to Arlene, the blame for these tensions lie with Tammy and her children, who "on numerous occasions . . . verbally f[ought] . . . and scream[ed] profanities" at Allen and at each other. In contrast, according to Tammy, the blame lies entirely with Arlene, who "fought constantly" with Allen to the point that Allen and Arlene had to seek marriage counseling.

Regardless of who was initially to blame, these intra-family tensions escalated upon Allen's death. Allen had written a will bequeathing $100,000 and a grave site to Arlene. Arlene, however, was never able to collect this bequest as Allen's valuable assets had all passed outside of probate, leaving his estate with insufficient funds. Allen had designated his three children as the bene-ficiaries of the majority of his assets, which included a home, life insurance policies, retirement accounts, and other savings accounts. In fact, the sole asset for

which Allen had not specifically designated a beneficiary was the life insurance policy at issue in this case.

Allen received this life insurance policy as part of his compensation package from SuperValu, where he had worked as a pharmacist since 2007. The policy, which was issued by Minnesota Life Insurance Company, provided $74,000 in basic coverage and $341,000 in supplemental coverage. In the event that the policyholder failed to designate a beneficiary by his date of death, the proceeds would pass to the policyholder's spouse by default. On the date of Allen's death, Minnesota Life had never received any indication that Allen wished to designate a beneficiary. Minnesota Life had never received a change-of-beneficiary form from Allen, nor does it appear that Allen had ever sent a change-of-beneficiary form to Minnesota Life.

Nonetheless, it appears that Allen may have filled out a change-of-beneficiary form prior to his death. In the days immediately following Allen's death, Tammy, Scott, and Richard (hereinafter "the children") found a change-of-beneficiary form that was allegedly completed by their father on August 15, 2008—more than a year before his death—but never submitted to Minnesota Life. This form designated the children as the beneficiaries to the SuperValu policy, excluding Arlene entirely. The children submitted this form to Minnesota Life through their attorney on December 23, 2009, approximately three weeks after their father's death. Arlene, in turn, submitted a claim to Minnesota Life through her attorney on February 1, 2010, claiming

to be the policy's sole beneficiary by default. And so the present dispute over the proceeds from the SuperValu policy began.

Over seven months passed, yet Arlene and the children were never able to reach an agreement about how to distribute the SuperValu policy proceeds. Consequently, Minnesota Life filed this interpleader action under 28 U.S.C. § 1332 and Fed. R. Civ. P. 22, asking the federal district court to allow Minnesota Life to deposit the disputed proceeds with the court, to discharge Minnesota Life from any further liability under the SuperValu policy, to determine the proper beneficiary of the policy, and to award Minnesota Life its costs from bringing the action. The district court granted judgment to Minnesota Life the next day, directing it to deposit the policy proceeds "with the Clerk of the Court in an interest bearing account." Arlene and the children then resumed their fight over the policy proceeds in the federal district court.

This fight continued for almost a year until both Arlene and the children filed cross-motions for summary judgment in the summer of 2011. On March 13, 2012, the district court granted Arlene's motion and denied the children's motion. Even if Allen had filled out a change-of-beneficiary form on August 15, 2008, as the children alleged, the district court found that Allen had neither exactly complied nor substantially complied with the SuperValu policy's requirements for changing beneficiaries since he had never mailed the completed form to Minnesota Life during the fifteen months before

his death. Thus, Arlene, the default beneficiary, was entitled to the proceeds of the SuperValu policy.

The children filed a timely appeal of the district court's grant of summary judgment to Arlene. Although the children initially expressed an intent to appeal both the district court's grant of summary judgment to Arlene and the district court's denial of summary judgment to them, they have subsequently abandoned the appeal regarding their motion for summary judgment. The children now request that we reverse the district court's decision on Arlene's motion and remand the case for trial. For the reasons that follow, we decline the children's request and affirm the judgment of the district court.

## II

Before we can discuss the merits of this case, we must first ensure that our appellate jurisdiction is secure. We pointed out a procedural irregularity in the district court's disposition of the case at the outset of this appeal, in accordance with our "obligation to examine [appellate] jurisdiction sua sponte, even if the parties fail[ed] to raise a jurisdictional issue." *Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 660 (7th Cir. 1998). The children brought this appeal pursuant to 28 U.S.C. § 1291, which gives us jurisdiction over "appeals from all final decisions of the district courts." But as soon as we looked at the decision of the district court in this case, we became concerned that it was not, in fact, final.

A district court's decision is final if "the district court has finished with the case." *Chase Manhattan Mortg. Corp. v. Moore*, 446 F.3d 725, 726 (7th Cir. 2006). The district court's initial order entering judgment in favor of Arlene and against the children (issued on March 13, 2012) certainly sounded final. Explicitly dismissing the case "in its entirety," the initial order even described itself as a "final and appealable order." Despite this language, however, the order was not the last one issued by the district court prior to appeal. On March 27, 2012, the district court entered an order amending the March 13th order. Shortly after her victory on the merits, Arlene filed a motion to amend the judgment under Fed. R. Civ. P. 59(e), disputing the amount of interest that Minnesota Life had paid on the SuperValu policy proceeds since Allen's death. In response to Arlene's motion, the district judge amended the judgment by "reserv[ing] jurisdiction to resolve any dispute between the Plaintiff Minnesota Life . . . and Claimant-Defendant Arlene Kagan of the proper amount of interest to be paid under the policy."

The language of the district court's amended order troubled us because it suggested that the district court had not actually finished with the case. Despite the fact that the court had resolved all disputes between Arlene and the children, it appeared that an active dispute still remained between Arlene and Minnesota Life. Furthermore, the amended order indicated that the district court still considered Minnesota Life to be a party fully before the court, despite its earlier order "grant[ing] judgment in favor of the Plaintiff, Minnesota

Life." For these reasons, we ordered the parties to file jurisdictional memoranda stating why the March 27th amended order was a final decision for the purposes of 28 U.S.C. § 1291, and thus, appealable to our court.

A single statement in Arlene's jurisdictional memorandum resolved our concerns: "Arlene contacted Minnesota Life and received an explanation of how the interest was determined. After due consideration, it appears Minnesota Life has paid the proper amount of policy interest due under the terms of the policy. Therefore, Arlene disclaims any intent to seek further amendment of the judgment." With this statement, Arlene ended the one dispute that remained in the case after the March 27th amended order, "'leav[ing] nothing for the court to do but execute the judgment.'" *ITOFCA, Inc. v. MegaTrans Logistics, Inc.*, 235 F.3d 360, 363 (7th Cir. 2000 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978)).

Previously, we have found a party's repudiation of any potentially remaining claims sufficient to convert a district court's nonfinal order into a final, appealable one for the purposes of § 1291. In fact, this situation has arisen several times before our court in the context of an appeal from a district court's dismissal of a claim without prejudice. Dismissals without prejudice are normally nonfinal for the purposes of § 1291 "because the plaintiff remains free to refile his case." *Mostly Memories, Inc. v. For Your Ease Only, Inc.*, 526 F.3d 1093, 1097 (7th Cir. 2008). Still, as long as the party "explicitly agrees . . . to treat the dismissal of the claim as having

been with prejudice"—in other words, the party agrees not to refile the claim in the district court in the event of an unsuccessful appeal—we have found jurisdiction secure for the appeal to proceed. *Nat'l Inspection & Repairs, Inc. v. George S. May Int'l Co.*, 600 F.3d 878, 883 (7th Cir. 2010) (finding jurisdiction over an appeal secure once "the parties submit[ted] a revised statement regarding their respective intent not to pursue the[] claims" dismissed by the district court without prejudice); *see also India Breweries, Inc. v. Miller Brewing Co.*, 612 F.3d 651, 657 (7th Cir. 2010) (finding jurisdiction over an appeal secure once the appellee agreed "unequivocally [to] dismiss[] its counterclaims with prejudice after [our court] pressed the matter at oral argument").

In reaching these prior decisions, we have hearkened back to the legislative purpose for enacting the § 1291 finality requirement: to "prevent[] the debilitating effect on judicial administration caused by piecemeal appeal disposition of what is, in practical consequence, but a single controversy." *Coopers*, 437 U.S. at 471 (quotation and citation omitted). Once a party repudiates all potentially remaining (or refileable) claims, "[t]he risk of piecemeal appeals from the district court . . . [becomes] nonexistent," and any concern about the effect on judicial administration disappears. *Mostly Memories*, 526 F.3d at 1097. Here, since Arlene has repudiated her claim for additional interest against Minnesota Life, which was the only issue still awaiting resolution by the district court, the risk of a later, piecemeal appeal in this case is similarly nonexistent.

As a result, we find Arlene's repudiation of her remaining dispute with Minnesota Life sufficient to ensure that the March 27th amended order is a final decision for the purposes of 28 U.S.C. § 1291. By "fully extinguishing all lingering claims" before the district court, *India Breweries*, 612 F.3d at 657, Arlene has eliminated from the case any "remaining elements . . . apt to come back on a second appeal." *First Health Grp. Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 801 (7th Cir. 2001). Because the last order issued by the district court is now properly characterized as a final decision under § 1291, we have jurisdiction to hear this appeal.

**III**

Having determined that our jurisdiction is secure under 28 U.S.C. § 1291, we turn now to the merits. Because the district court granted summary judgment to Arlene, we review the district court's disposition de novo, "construing the evidence and all reasonable inferences in favor of" the children, who are "the party against whom the motion under consideration [wa]s made." *Duable Mfg. Co. v. U.S. Dep't of Labor*, 578 F.3d 497, 501 (7th Cir. 2009) (quotation and citation omitted). The children argue that summary judgment was inappropriate here because "a question of fact existed concerning Allen's intentions in changing the beneficiary" of the SuperValu policy. The terms of the SuperValu policy stipulated the requirements that were necessary before Allen could successfully change the policy's beneficiary:

An insured can add or change beneficiaries if all of the following are true:

(1) the insured's coverage is in force; and

(2) we have written consent of all irrevocable beneficiaries; and

(3) the insured has not assigned the ownership of his or her insurance.

A request to add or change a beneficiary must be made in writing. All requests are subject to our approval. A change will take effect as of the date it is signed, but will not affect any payment we make or action we take before receiving an insured's notice.

The written form provided to policyholders by Minnesota Life for enacting such a change—entitled "Beneficiary Designation and Change Request"—provides the following instructions:

1. Print or type in the space below, the full name, relationship to the employee and share % of each beneficiary to be named.

2. Sign and date the completed form and return it to Minnesota Life.

3. The designation applies to your Basic and any Optional coverage.

4. Call 1-866-293-6047 with questions.

Because we must draw all reasonable inferences in favor of the children at this stage, we assume that the

completed Beneficiary Designation and Change Request form found by Allen's children after his death is not a forgery. That is, we assume that Allen actually filled out a Change Request form, naming his children as beneficiaries, on August 15, 2008. But the children have not presented any evidence whatsoever suggesting that Allen returned this Change Request form to Minnesota Life. Therefore, we assume that Allen filled out the Change Request form on August 15, 2008, but for some reason, never sent it into Minnesota Life.

The parties agree that Illinois law governs the resolution of this case. Under Illinois law, "[w]here the insurer has specified in the policy the method for changing the beneficiary, some type of compliance with the policy terms is required." *Hoopingarner v. Stenzel*, 768 N.E.2d 772, 776 (Ill. App. Ct. 2002). Of course, exact compliance with policy terms will effectuate a change in an insurance policy's beneficiaries; however, in Illinois, "exact compliance with the terms of the policy is not necessary" to effectuate a change. *Aetna Life Ins. Co. v. Wise*, 184 F.3d 660, 664 (7th Cir. 1999). Recognizing that "technical compliance with the policy provisions is solely for the benefit of the insurer, to protect it from paying the wrong person and being forced to pay twice," Illinois courts recognize the doctrine of substantial compliance. *Travelers Ins. Co. v. Smith*, 435 N.E.2d 1188, 1190 (Ill. App. Ct. 1982). As long as a policyholder has shown sufficient "intent to make the change [in beneficiaries] and positive action towards effecting that end," this doctrine allows courts to overlook a policyholder's failure to comply with every detail of a policy's

terms. *Dooley v. James A. Dooley Assocs. Emps. Ret. Plan*, 442 N.E.2d 222, 227 (Ill. 1982). Thus, under Illinois law, Allen's actions on August 15, 2008, successfully changed the beneficiaries of the SuperValu policy if either (1) his actions exactly complied with the policy's requirements for changing beneficiaries, or (2) they substantially complied with the policy's requirements for changing beneficiaries. We review both possibilities below.

## A

In order to determine whether Allen's completion of the Beneficiary Designation form on August 15, 2008, constituted exact compliance with the SuperValu policy's terms, we must first interpret the policy's terms. This insurance policy is a contract, and in Illinois, interpreting "the meaning of contract language . . . presents a question of law." *Gallagher v. Lenart*, 874 N.E.2d 43, 50 (Ill. 2007). Moreover, standard principles of contract law apply to the interpretation of Illinois contracts:

> The primary objective in construing a contract is to give effect to the intent of the parties. A court must initially look to the language of a contract alone, as the language, *given its plain and ordinary meaning*, is the best indication of the parties' intent. Moreover, because words derive their meaning from the context in which they are used, *a contract must be construed as a whole*, viewing each part in light of the others. *The intent of the parties is not to be gathered from detached por-*

*tions* of a contract or from any clause or provision standing by itself. If the language of the contract is susceptible to more than one meaning, it is ambiguous. In that case, a court may consider extrinsic evidence to ascertain the parties' intent.

*Id*. at 58 (emphasis added) (citations omitted). With these general principles in mind, we turn back to the language of the SuperValu policy.

Both parties acknowledge that Allen did not designate a beneficiary upon receipt of the SuperValu policy, so by the terms of its default provision, Arlene was, in effect, the presumptive beneficiary, subject to any subsequent designation or changes. Moreover, neither party disputes whether Allen was eligible to change the beneficiaries of the SuperValu policy on August 15, 2008. Allen's coverage under the policy was currently in force, and the policy had no irrevocable beneficiaries. Nor had Allen previously assigned his ownership in the policy. Therefore, under the policy's terms, Allen was free to change its beneficiaries. The parties' dispute instead centers on the meaning of the following clause, contained within the policy's death benefit information section: "A request to add or change a beneficiary must be made in writing. All requests are subject to our approval. A change will take effect as of the date it is signed, but will not affect any payment we make or action we take before receiving an insured's notice."

Using this language, the children argue that Allen need not have personally sent the Beneficiary Designation form into Minnesota Life in order to change the

beneficiaries of the SuperValu policy. All that the policy required, according to the children, was for Allen to make a request "in writing," which he did by completing the Beneficiary Designation form. The change in beneficiaries, according to the policy's terms, "t[ook] effect as of the date it [was] signed," August 15, 2008. Nothing in the policy's terms states that Allen himself had to return the form to Minnesota Life, and nothing in the policy's terms limits the amount of time after completion in which the form had to be returned to Minnesota Life. In fact, the death benefit information section never discusses returning the form to Minnesota Life. The children's counsel conceded at oral argument that the form would have to be returned at some point in order to make Minnesota Life aware of a change in beneficiaries. Indeed, the children would be remiss not to make such a concession given that the instructions on the Beneficiary Designation form itself tell the policyholder to "[s]ign and date the completed form and return it to Minnesota Life." But in the absence of explicit policy terms regulating the manner of the form's return, the children argue that when and how the form must be returned is a question for the jury.

The terms of the SuperValu policy, as the district court correctly pointed out, are hardly "a model of clarity." Yet the children do seem to have a point when the phrase, "A change will take effect as of the date it is signed," is viewed in isolation. By itself, this phrase suggests that all a policyholder needs to do is complete and sign the Beneficiary Designation form in order to change beneficiaries. Under this line of reasoning, as

long as Minnesota Life receives the form before it is obligated to pay the death benefit to the policyholder's beneficiaries, the company should not care who sent back the Beneficiary Designation form, how they sent it back, or when they sent it back.

But it is inappropriate to view a phrase contained within a contract in isolation; "a contract must be construed as a whole, viewing each part in light of the others." *Gallagher*, 874 N.E.2d at 58. Words derive their meaning not just from dictionary definitions but also from context. *Bd. of Trade of City of Chicago v. Dow Jones & Co., Inc.*, 456 N.E.2d 84, 90 (Ill. 1983). When the phrase, "A change will take effect as of the date it is signed," is read in context of the rest of the policy terms, it becomes clear that a policyholder's responsibilities do not end after completing and signing the Beneficiary Designation form. Rather, the signing of a Beneficiary Designation form is merely the first step in "request[ing] to add or change a beneficiary." And that request is not guaranteed to be successful; on the contrary, the request is "subject to [Minnesota Life's] approval." The juxtaposition of the words "request" and "approval" with the phrase in question indicates that new beneficiaries are not set in stone as soon as a policyholder completes and signs a form. Additional action is required; a policyholder must request Minnesota Life's approval for the desired change. But in the present case, there is no evidence that Allen ever attempted to request Minnesota Life's approval.

Thus, after considering the language of the death benefit information section as a whole, we believe that

the phrase, "A change will take effect as of the date it is signed," must mean that only an *approved* change will take effect as of the date it is signed. In other words, a change that follows all policy requirements— including the policyholder submitting a request for Minnesota Life's approval—will take effect as of the date it is signed. Our interpretation of this phrase in the death benefit information section of the SuperValu policy is bolstered once we also consider the instructions for policyholders printed on the Beneficiary Change form. This form tells policyholders to return the form to Minnesota Life after signing, dating, and completing the form. Once again, these instructions suggest that a policyholder's responsibilities do not end upon completion of the Beneficiary Designation form; something more is required to add or change a beneficiary. Yet Allen never did anything more; he stopped after signing, dating, and completing the Beneficiary Designation form.

Because Allen stopped after completion of the Beneficiary Designation form, he did not exactly comply with the SuperValu policy's terms. Both the death benefit information section of the policy and the instructions provided on the Beneficiary Designation form itself indicated that Allen needed to send the form back to Minnesota Life. But Allen never did. Therefore, Allen complied with only some—but not all—of Minnesota Life's requirements for changing beneficiaries. Since Allen failed to comply exactly with Minnesota Life's requirements for changing beneficiaries, the most that the children can hope for is that Allen substantially

complied with Minnesota Life's requirements. We turn to an analysis of substantial compliance now.

**B**

Even though Allen did not exactly comply with the SuperValu policy's requirements for changing beneficiaries, exact compliance is not required in Illinois. Like most other states, Illinois recognizes the doctrine of substantial compliance when assessing whether a policyholder has successfully changed beneficiaries. *Travelers*, 435 N.E.2d at 1190. Under this doctrine, which "by its very nature contemplates something less than actual compliance," *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 568 (7th Cir. 2002), a policyholder's failure to follow all "technical requirements will not defeat the clear and manifested intention . . . to change a beneficiary designation." *Aetna*, 184 F.3d at 664. Still, proving substantial compliance in Illinois is not easy; it requires showing (1) "a clear expression of the insured's intention to change beneficiaries," and (2) a "concrete attempt [by the insured] to carry out his intention as far as was reasonably in his power." *Dooley*, 442 N.E.2d at 227 (quotations and citations omitted). Determinations of substantial compliance are generally reserved for the jury; however, a judge may appropriately grant summary judgment on a substantial compliance issue when the policyholder "clearly failed to comply substantially with the requirements for changing a beneficiary." *Hoopingarner*, 768 N.E.2d at 776.

The parties spend much time arguing about the first element of substantial compliance—that is, whether Allen made a clear expression to change beneficiaries. In support of their arguments, the parties submit evidence about the contentious nature of Allen's relationship with each of his family members. The children claim that Allen had a bad relationship with Arlene, which is why Allen completed the Beneficiary Designation form. Meanwhile, Arlene claims that Allen had a bad relationship with his children, which is why Allen never returned the Beneficiary Designation form to Minnesota Life. Fortunately, we need not assess which party is telling the truth or whose evidence is stronger. In fact, we need not evaluate the first element at all since Allen's actions clearly do not satisfy the second element of a substantial compliance claim.

By filling out the Beneficiary Designation form on August 15, 2008, Allen arguably expressed some intention to change the beneficiaries of the SuperValu policy from Arlene to his children. But as Illinois case law makes clear, Allen did not carry out this intention "as far as was reasonably in his power." *Dooley*, 442 N.E.2d at 227. In *Dooley*, James A. Dooley, a former justice on the Illinois Supreme Court, met with his accountants twelve days before his death regarding a change in the beneficiaries of his retirement plan. Justice Dooley concluded this meeting by remarking that "there [wa]s no hurry about" making the necessary changes because "'[t]here [we]re other things that [he was] more interested in that [the accountants] could take care of.'" *Id*. at 225. Less than two weeks later, Justice Dooley

died without ever drawing up or signing a formal document (as he had done in the past) that changed the beneficiaries of his retirement plan. Under these circumstances, the Illinois Supreme Court upheld the trial court's decision that Justice Dooley had neither exactly nor substantially complied with the requirements for changing beneficiaries. *Id.* at 226. In reaching this holding, the Illinois Supreme Court reasoned, "The evidence here clearly indicates *decedent was contemplating changing beneficiaries and had done some work* in that regard. However, the evidence can also be considered as indicating *he knew his work was not complete.*" *Id.* at 227 (emphasis added). Quoting 5 Couch, *Insurance* § 28:75, at 179 (2d ed. 1960), the court continued, "'The mere fact that the insured takes preliminary steps with the intent of ultimately effecting a change of beneficiary does not in itself constitute substantial compliance and a change of beneficiary does not result therefrom.'" *Dooley*, 442 N.E.2d at 227.

Like Justice Dooley, Allen was apparently contemplating a change in beneficiaries for the SuperValu policy and "had done some work in that regard." *Id.* It seems unlikely that Allen would have taken the time to complete the Beneficiary Designation form on August 15, 2008, unless he was seriously considering a change. But also like Justice Dooley, Allen "knew his work was not complete." *Id.* In the fifteen months following his completion of the Beneficiary Designation form, Allen never sent the form into Minnesota Life—despite explicit instructions printed on the form telling him to do so. Even if we were to assume that Allen some-

how missed these very obvious printed instructions, Allen still should have known that "his work was not complete." *Id*. The children's own evidence demonstrates that Allen was quite adept at changing the beneficiaries of his assets. According to Tammy's affidavit, Allen had successfully named the children as the beneficiaries to four other life insurance policies and two retirement accounts during his lifetime. Because of his experience with these other assets, Allen must have been well aware that he needed to mail the Beneficiary Designation form into Minnesota Life in order to change its beneficiaries.

Examining a more recent Illinois case, *Hoopingarner*, 768 N.E.2d 772, only strengthens our conclusion that Allen's actions fell short of doing "everything within his power to effectuate a change in life insurance policy beneficiaries." *Aetna*, 184 F.3d at 664. In *Hoopingarner*, the decedent executed a change-of-beneficiary form, naming her housekeeper as the new beneficiary to her annuity policy, but never sent the form into the policy's management company, New York Life. 768 N.E.2d at 775. As the decedent's health was failing two-and-a-half years later, the housekeeper realized that the decedent had never sent in the form. The housekeeper asked her friend to send a copy of the executed change-of-beneficiary form to New York Life, which arrived shortly before the decedent's death. Under these facts, the Appellate Court of Illinois found that the decedent had not substantially complied with the requirements for changing the annuity's beneficiary because she had "never sent the change of beneficiary form to New York

Life or furnished any information to New York Life regarding a desire to change the beneficiary of the annuity." *Id*. at 776.

In spite of facts that are highly reminiscent of the case at hand, *Hoopingarner*—according to Allen's children—is distinguishable from this case because the *Hoopingarner* annuity unambiguously required policyholders to "furnish[] the necessary information to" New York Life. *Id*. Moreover, the *Hoopingarner* annuity did not contain any claims that a "change w[ould] take effect as of the date it is signed." Perhaps the terms of the *Hoopingarner* annuity were more clearly written than the terms of the SuperValu policy at issue in this case. Nonetheless, the children cannot get around the fact that the form here contained explicit, visible instructions for policyholders to "return it to Minnesota Life" upon completion.

For all of these reasons, we find that Allen did not substantially comply with the SuperValu policy's requirements for changing beneficiaries. He had fifteen months before his death to return the completed form to Minnesota Life, but he never did. Before his death, Allen had returned the change-of-beneficiary forms for all the other insurance and retirement policies he held. Thus, if Allen truly intended to change the beneficiaries of the policy at issue, he should have known to return the Beneficiary Designation form to Minnesota Life. And he should have done it with some haste, given that he was not well at the time of the form's completion on August 15, 2008. Allen had suffered from heart problems for years and had even undergone a

prior open-heart surgery—making a sudden, fatal heart attack a real possibility—and yet something kept him from sending the completed form into Minnesota Life during the remaining fifteen months of his life. Something prevented Allen from doing "everything within his power to effectuate a change in life insurance policy beneficiaries." *Aetna*, 184 F.3d at 664. That something also prevents us from making a finding of substantial compliance.

**IV**

In addition to asking for an affirmance of the district court, Arlene asks our court for sanctions against the children for filing a "frivolous appeal" under Fed. R. App. P. 38. Although we ultimately side with Arlene on the merits, we cannot agree with her characterization of the children's appeal as "frivolous." An appeal is frivolous if "'the result is obvious or when the appellant's argument is wholly without merit.'" *Ins. Co. of W. v. Cnty. of McHenry*, 328 F.3d 926, 929 (7th Cir. 2003) (quoting *Grove Fresh Distribs. v. John Labatt, Ltd.*, 299 F.3d 635, 642 (7th Cir. 2002)). Characterizing the children's appeal as "utterly hopeless," Arlene emphasizes in her motion for sanctions that the children's appeal was motivated solely by their "sheer obstinacy" and personal animosity towards her.

While we do not doubt that a great deal of personal animosity exists between the two parties in this case, we believe that Arlene exaggerates the "hopelessness" of the children's appeal. The phrase, "A change will take

effect as of the date it is signed," contained within the SuperValu policy terms is challenging to interpret and—as demonstrated by the length of this opinion—has taken us many pages to explain. The district court correctly characterized the terms of this policy as "not a model of clarity." As a result, "it was not a foregone conclusion that we would interpret [the policy's] language in the same way as the district judge." *Ins. Co. of W.*, 328 F.3d at 929. Under such circumstances, we remind the parties that "[i]t is within the sound discretion of this court to decide whether to impose sanctions." *Id*. This discretion here guides us to conclude that characterizing the children's appeal as lacking a good faith basis in fact or law, which is the hallmark of a frivolous appeal, would be inappropriate. *See id*. (refusing to grant sanctions against appellant when the basis of the appeal involved an "ambiguity" in the language of an insurance policy). Consequently, we AFFIRM the judgment of the district court for appellee Arlene Kagan, but we DENY Arlene's motions for sanctions.